**JOURNAL–GAZETTE COMPANY, INC.,** Appellant (Defendant below),

v.

**BANDIDO'S, INC., Appellee** (Plaintiff below).

No. 57S03–9709–CV–00495.

Supreme Court of Indiana.

June 23, 1999.

James P. Fenton, Eilbacher Scott, P.C., Cathleen M. Shrader, John D. Walda, Barrett & McNagny, Fort Wayne, Indiana, Attorneys for Appellant.

Edward L. Murphy, Jr., Diana C. Bauer, Miller Carson Boxberger & Murphy, Robert E. Connolly, O'Dowd Wyneken & Connolly,

Fort Wayne, Indiana, Attorneys for Appellee.

## ON PETITION TO TRANSFER

SULLIVAN, Justice.

In grappling with the right to freedom of speech provided by the First Amendment versus the right of individuals to be protected from attacks upon their reputations, the Court of Appeals determined that Bandido's failed to prove by clear and convincing evidence that the Fort Wayne Journal–Gazette newspaper published a subheadline with actual malice. While we agree with the Court of Appeals's conclusion, we write to hold that the actual malice standard of proof required in defamation cases involving matters of public or general concern applies not only to public figures, but to private individuals as well.

### Background

Bandido's is a Mexican-style restaurant with three locations in Fort Wayne Indiana, and one in Lima, Ohio. On September 13, 1988, the Allen County Board of Public Health conducted a health inspection of the north-side Bandido's in Fort Wayne. In the report, the inspector identified several violations and made the following relevant remarks: "Evidence of flies, roaches and rodents noted. Advise exterminator to do a full clean out of premise. Rodent droppings noted only in restroom." (R. at 631.) Immediately thereafter, Mr. Schindler, the owner of Bandido's, received a letter from the Fort Wayne—Allen County Board of Public Health advising him of a hearing to determine whether the restaurant permit should be revoked. On October 3, the day before the hearing, another inspector visited the restaurant for the sole purpose of gathering information for the hearing. At this time, the inspector did not find any evidence of rodents. On October 4, without permitting Mr. Schindler to speak, the Board of Public

Health revoked Bandido's permit and closed the restaurant. In a letter dated October 5, 1988, to Mr. Schindler, Dr. Irmscher, the Commissioner for the Board of Public Health, stated, "This permit was revoked after a full and complete hearing and review of all food inspections for 1988." (R. at 1155.)

June Remley was assigned the task of writing an article concerning the closing of Bandido's for the Fort Wayne Journal–Gazette, a daily newspaper. Once written, the story was turned over to her supervisor, Gabby Jacobs, the Assistant Metro Editor. The story was untitled and Remley never saw the story again before publication. Jacobs's job was to resolve any questions or ambiguities and generally get the story ready for publication. The story was then submitted to the news editor, Ellen Garner. Garner's role was to lay out the story for publication, do an initial edit, and make sure the story was still current. Garner also determined how much space was available for the story and for the headline. Next, the story proceeded to the copy editor, Sheila Pinkley. Pinkley's responsibility was to do a final edit of the story which required a word for word, line by line read. Pinkley's job was also to make any necessary changes to meet the spacing guidelines. Finally, Pinkley wrote the headline and the subheadline which are at issue in this case. The story with the headline was then submitted to Pinkley's supervisor, Bill Leonard. Leonard's duty was to approve everything that had been done, do a final review, make sure the layout was acceptable, and make sure the headline accurately summarized the story. The story then went to the Managing Editor, Ellen Garner.[1] Garner reviewed the story and headline. Finally, the page proof editor, Tom Jones, looked for typographical errors, story and headline problems and things of that sort.

The article was published on October 6, 1998, and the headline read:[2]

---

1. Ordinarily, Sylvia Smith worked as the Managing Editor but was off that evening.

2. The Journal–Gazette publishes three editions each day. The first edition is circulated in northwestern Ohio. The second edition is provided to

Indiana counties surrounding Fort Wayne. The final edition is published for the Fort Wayne area. The headline provided in the text ran in the first edition while the second edition contained the headline, but not the subheadline. Consequently, the trial court determined that the

Health board shuts doors of Bandido's
Inspectors find rats, roaches at local eatery

While the story itself was accurate, the sub-headline inaccurately used the word "rats." The health board never discovered rats at Bandido's and the word "rats" never appeared in the article. The next day, Mr. Schindler advised the Journal–Gazette of the mistake and asked for an immediate retraction. On October 7, 1988, the Journal–Gazette published another article in which it noted the mistake and apologized.[3] The next day, Robert Wright, Bandido's attorney, wrote the Journal–Gazette and the Journal–Gazette's attorney a letter expressing his and Mr. Schindler's satisfaction with the article and the apology that appeared in the story, and his belief that the correction would hopefully reduce the damages suffered by Mr. Schindler. Shortly after this letter was written, Mr. Schindler retained a new lawyer. On October 18, 1988, Robert Connolly, Bandido's new attorney, sent the Journal–Gazette a letter indicating that the October 7, 1988, follow-up story was insufficient because the headline made no reference to a retraction. This letter requested the Journal–Gazette to print a headline retraction the same size as the original story and in the same location. The Journal–Gazette did not comply with this request and consequently Bandido's filed a defamation suit on November 21, 1988.

The trial court concluded that there was no genuine issue of material fact with respect to

the element of actual malice and granted summary judgment in favor of the Journal–Gazette. On appeal, the Court of Appeals determined that there were facts in dispute and conflicting inferences on the issue of actual malice, reversed the trial court's decision, and remanded for a trial on the merits. *Bandido's, Inc. v. Journal–Gazette Co.,* 575 N.E.2d 324 (Ind.Ct.App.1991), *transfer denied.* At the conclusion of trial, the jury awarded Bandido's $985,000 in damages. The Journal–Gazette appealed and the Court of Appeals reversed the trial court, finding that there was not clear and convincing proof of actual malice. *Journal–Gazette Co. v. Bandido's, Inc.,* 672 N.E.2d 969 (Ind.Ct.App. 1996).

We will provide additional facts when necessary.

### Discussion

∎ Bandido's defamation suit against the Journal–Gazette implicates the First Amendment to the United States Constitution. The First Amendment secures freedom of the press.[4] It "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." [5] *New York Times Co. v. Sullivan,* 376 U.S. 254, 269, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (quoting *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)). There is a "national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Id.* at 270–71, 84

second edition was not defamatory. The third edition contained a revised subheadline: "Investigators find rats, bugs at north-side eatery."

**3.** The article was titled, "Owner says Bandido's likely to reopen today." The third paragraph of the story contained the following relevant statements:

Because of an editing error, a headline—not the story—in some editions of Thursday's Journal–Gazette said inspectors had found rats and bugs at the restaurant.
No evidence of rats was found at the restaurant. Journal–Gazette apologizes for the inaccuracy of the headline.
(R. at 1203.)

**4.** The First Amendment provides the following: Congress shall make no law respecting an establishment of religion, or prohibiting the free

exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

**5.** The First Amendment goal of protecting speech serves several purposes. Gerald R. Smith, *Of Malice and Men,* 27 Val. U.L.Rev. 39, 43 (1992). First, "[t]he free flow of information in the 'marketplace of ideas' ensures the vitality of a democratic government, provides a check on governmental abuse, and aids in the choices among competing opinions and options." Second, "[f]reedom of speech also acts as a safety valve, reducing the incidence of more destructive modes of expressing dissatisfaction." And finally, "[t]he right to free expression also promotes self-fulfillment, personal growth and self-realization." *Id.* at 44.

S.Ct. 710. The First Amendment has particularly protected the press because it is the means through which the public is informed of government actions and other matters of public interest. However, the rights under the First Amendment are not absolute, for they must be weighed against other societal interests. For example, because society has a strong interest in protecting attacks upon individual reputation, the law of defamation was created. A defamatory communication is defined as one that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." [6] *Doe v. Methodist Hospital,* 690 N.E.2d 681, 686 (Ind.1997) (quoting Restatement (Second) of Torts § 559 (1977)); *see Near East Side Community Org. v. Hair,* 555 N.E.2d 1324, 1330 (Ind.Ct.App.1990); *Cochran v. Indianapolis Newspapers, Inc.,* 175 Ind.App. 548, 553, 372 N.E.2d 1211, 1217 (1978).

In the process of protecting reputation, limitations have been placed on the freedom of speech. This was a result of the long standing principle that defamation was not protected speech, *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571–72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), and could therefore be legislated by the states individually. However, the law of defamation has dramatically changed in the last few decades. In the landmark decision of *New York Times,* 376 U.S. at 254, 84 S.Ct. 710, the United States Supreme Court placed limits on the liability for defamation. *New York Times* was just the beginning of the Supreme Court's attempt to confine the state laws on defamation to conform with First Amendment privileges.

In *New York Times,* the Supreme Court held that the Constitution mandates "a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of

whether it was false or not." *Id.* at 279–80, 84 S.Ct. 710. Soon thereafter, the Supreme Court determined that the same requirement should apply to "public figures." *Curtis Publ'g Co. v. Butts,* 388 U.S. 130, 164, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). Several years later, in *Rosenbloom v. Metromedia,* the Court rejected any distinction between a public and private individual because it made "no sense in terms of the First Amendment guarantees." 403 U.S. 29, 46, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). Instead, the *Rosenbloom* Court determined that the controlling issue in determining when the *New York Times* standard of actual malice applied was whether the issue concerned a matter of public or general concern. *Rosenbloom,* 403 U.S. at 52, 91 S.Ct. 1811.

Three years later, observing that there had been a "general problem of reconciling the law of defamation with the First Amendment," the Supreme Court reconsidered its decision in *Rosenbloom. Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 333, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In doing so, the Supreme Court determined "that the state interest in compensating injury to the reputation of private individuals requires that a different rule should obtain with respect to them." *Id.* at 343, 94 S.Ct. 2997. Consequently, the Supreme Court changed its position and decided that a negligence standard would be imposed for defamation suits brought by private individuals in federal court, but left it up to States to define for themselves the appropriate standard of liability for defamatory statements made about a private individual. *Id.* at 347, 94 S.Ct. 2997.

The Indiana Court of Appeals defined the standard it would apply for defamation of private individuals in *Aafco Heating & Air Conditioning Co. v. Northwest Publications, Inc.,* 162 Ind.App. 671, 321 N.E.2d 580 (1974), *cert. denied,* 424 U.S. 913, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976). In *Aafco,* the Court of Appeals decided to continue with the *Rosenbloom* approach of applying the

---

**6.** "Whether [a communication] is defamatory 'depends, among other factors, upon the temper of the times, the current of contemporary public opinion, with the result that words, harmless in one age, in one community, may be highly damaging to reputation at another time or in a different place.'" *Schermerhorn v. Rosenberg,* 73 A.D.2d 276, 426 N.Y.S.2d 274, 282 (1980) (quoting *Mencher v. Chesley,* 297 N.Y. 94, 75 N.E.2d 257, 259 (1947)).

*New York Times* actual malice standard for matters of public or general concern, irrespective of whether the allegedly defamed plaintiff was a public or private individual. Although it has been over two decades since this approach was adopted by the Court of Appeals, this is our first opportunity to address the standard of liability required for private individuals claiming defamation.

I

▬▬ Today, we expressly adopt the *Aafco* approach establishing an actual malice standard in matters of public or general concern for private individual plaintiffs.[7] For nearly twenty-three years the law in Indiana has been that both private individuals and public figures must prove actual malice in order to recover in a defamation suit. As we have commented on numerous occasions, we place a high value on adherence to precedent as a primary instrument in providing the people of our state a predictable body of law.[8] Because we find no pressing reason to change the law, we affirm *Aafco* to be the law in Indiana.

Our decision to uphold *Aafco* is also based on our strong commitment to protecting the freedom of speech and expression provided in the First Amendment to the United States Constitution. Such commitment, we believe, should persist irrespective of the status of an alleged defamed plaintiff.

"If a matter is subject [sic] of public or general interest, it cannot suddenly become less so merely because a private

individual is involved, or because in some sense the individual did not 'voluntarily' choose to become involved. The public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety."

*Aafco,* 321 N.E.2d at 586–87 (quoting *Rosenbloom,* 403 U.S. at 43, 91 S.Ct. 1811). The Indiana Court of Appeals properly noted that applying a negligence standard to private individuals and an actual malice standard to public figures "assumes that society has a greater interest in protecting 'private' reputation than safeguarding the community standing and repute of 'public officials' and 'public figures.'" *Id.* at 587. Such an assumption does not exist in Indiana in matters of public or general concern where "[t]he reputations of public figures and public officials merit the same quantum of protection as those of private citizens." *Id.*

Second, we believe that in most instances there is little disparity in the ability of private versus public individuals to obtain access "to the channels of effective communication" in order to "counteract false statements." *But see Gertz,* 418 U.S. at 344, 94 S.Ct. 2997 (stating that public figures can more easily rebut false statements due to increased access to communication channels).

Only rarely will a public official or public figure have attained sufficient prominence to commend media attention which will

---

7. As stated under *Background, supra,* the trial court initially granted summary judgment in favor of the Journal–Gazette. Bandido's appealed the grant of summary judgment and in the course of remanding to the trial court for a trial on the merits, the Court of Appeals referred to Bandido's as a *"private individual." Bandido's, Inc. v. Journal–Gazette Co.,* 575 N.E.2d 324, 326 (Ind.Ct.App.1991). During trial, the jury was instructed that if the material published concerned an event of public or general concern, then Bandido's was required by *Aafco* to prove actual malice. (R. at 882.) A determination of whether a controversy is of public or general concern is a question of law to be determined by the trial judge and not the jury. Consequently, it was error for the court to provide this instruction. The jury was also instructed that Bandido's is a limited-purpose public figure and Ban-

dido's did not object to this characterization at trial. (R. at 850.) To the extent that Bandido's was tried as a limited-purpose public figure, the holding in *Aafco* is not relevant to resolve the case at hand nor is the issue properly before this Court. Nevertheless, we find it appropriate to address our view on *Aafco* as it relates to the future of defamation law in Indiana.

8. *See Nelson v. Parker,* 687 N.E.2d 187, 190 (Ind. 1997) (recognizing the importance of settled rules in property law and that stability is desirable to predict outcomes); *Marsillett v. State,* 495 N.E.2d 699, 704 (Ind.1986) ("Under the doctrine of *stare decisis,* this Court adheres to a principle of law which has been firmly established. Important policy considerations militate in favor of continuity and predictability in the law.").

provide a meaningful chance to rebut and defend against defamatory falsehood. Even in the rare case where an adequate opportunity for reply is afforded, it is unlikely that the rebuttal statements will receive the same degree of public attention as the published defamation. It would appear that the proper solution for any lack of access on the part of all citizens, whether "public" or "private" is not the expansion of the right to sue for defamation, but rather the passage of state laws creating a limited right to respond to defamatory falsehoods.

*Aafco,* 321 N.E.2d at 587 (footnote omitted).

Third, we do not find that public figures' voluntary exposure to public scrutiny necessarily entitles non-public figures to greater protection from defamation.

> The argument that public officials and public figures assume the risk of defamation by voluntarily placing themselves in the public eye is a misconception of the role which every citizen is expected to play in a system of participatory self-government. Every citizen, as a necessary part of living in society, must assume the risk of media comment when he becomes involved, whether voluntarily or involuntarily, in a matter of general or public interest. It has long been recognized that "[e]xposure of the self to others in varying degrees is a concomitant of life in a civilized community."

*Id.* at 588 (alteration in original) (quoting *Time, Inc. v. Hill,* 385 U.S. 374, 388, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967)). The *Rosenbloom* Court responded to similar arguments in the following manner:

> [T]he idea that certain "public" figures have voluntarily exposed their entire lives to public inspection, while private individuals have kept theirs carefully shrouded from public view is, at best, a legal fiction. In any event, such a distinction could easi-

ly produce the paradoxical result of dampening discussion of issues of public or general concern because they happen to involve private citizens while extending constitutional encouragement to discussion of aspects of the lives of "public figures" that are not in the area of public or general concern.

*Rosenbloom,* 403 U.S. at 48, 91 S.Ct. 1811.

We acknowledge the appeal of the arguments made in *Gertz* and think that the news media bear a heavy moral responsibility not to invade the private lives of private citizens with respect to their private affairs. And when they do, they not only damage their own reputations, but undermine support for their First Amendment protections. But, moral responsibility is not in this context identical to legal liability. In our view, imposing legal liability only when the news media engage in conduct with actual malice in matters of public or general concern protects the rights and values embodied in the First Amendment to the fullest extent. A negligence standard in matters of public or general concern for private individuals likely would require the news media to censor stories of public or general concern or avoid publication of controversial articles. *See Aafco,* 321 N.E.2d at 588. This is because a negligence standard would permit private individuals to obtain favorable judgments on the basis that the news media failed to use reasonable care. "The uncertainty attendant upon a reasonable care standard would charge the press with 'the intolerable burden of guessing how a jury might assess the reasonableness of steps taken by it to verify the accuracy of every reference to a name, picture or portrait.'" *Id.* (quoting *Time,* 385 U.S. at 389, 87 S.Ct. 534). Such a rule would curtail the freedom of the press and undermine our attempt to protect speech that relates to matters of public or general concern.[9]

---

9. *See Aafco,* 321 N.E.2d at 588–89.

"In the normal civil suit where [the preponderance of the evidence] standard is employed, 'we view it as more serious in general for there to be an erroneous verdict in the defendant's favor.' *In re Winship,* 397 U.S. 358, 371, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In libel cases, however, we view an erroneous verdict for the plaintiff as most serious. Not only does it mulct the defendant for an innocent misstatement ... but the possibility of such error, even beyond the vagueness of the negligence standard itself, would create a strong impetus toward self-censorship, which the First Amendment cannot tolerate."
*Id.* (quoting *Rosenbloom,* 403 U.S. at 50, 91 S.Ct. 1811) (alteration added).

For all of the foregoing reasons, we adopt the rule in *Aafco* and hold it to be the law in Indiana.

## II

■ In exploring the parameters of public figure status, the United States Supreme Court established two classes of public figures: general-purpose and limited-purpose public figures. *Gertz,* 418 U.S. at 352, 94 S.Ct. 2997. "General purpose public figures are those individuals who 'achieve such pervasive fame or notoriety that [they] become[ ] a public figure for all purposes and in all contexts.'" *Trotter v. Jack Anderson Enters., Inc.,* 818 F.2d 431, 433 (5th Cir.1987) (quoting *Gertz,* 418 U.S. at 351, 94 S.Ct. 2997 (both alterations in original)). Consequently, "[a]bsent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life." *Gertz,* 418 U.S. at 352, 94 S.Ct. 2997. In the case of limited purpose public figures, they achieve their status by "thrust[ing] themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Id.* at 345, 94 S.Ct. 2997.

■ Whether an individual is a public figure is a question of law for the court to resolve. *Rosenblatt v. Baer,* 383 U.S. 75, 88, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). In the present case, there was no dispute as to Bandido's status. The trial court instructed the jury that Bandido's was a limited-purpose public figure, and Bandido lodged no objection to this characterization.[10] Given that no objection was made, we find this instruction to be binding on Bandido's and sufficient to establish its status as a limited-purpose public figure. *See Groves v. First Nat'l Bank of Valparaiso,* 518 N.E.2d 819, 824 (Ind.Ct.App.1988) (finding that an in-

struction to which no objection was made becomes the law of the case).

■ Moreover, even had Bandido's sought to contest its status as a limited-purpose public figure, we conclude that the authority on this issue cuts squarely against such a challenge. Restaurants and other establishments that actively advertise and seek commercial patronage have been routinely held to be public figures, at least for the limited purpose of consumer reporting on their goods and services. *See, e.g., Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264, 272 (3d Cir.1980); *Quantum Elec. v. Consumers Union of United States,* 881 F.Supp. 753, 764 (D.R.I.1995); *S & W Seafoods Co. v. Jacor Broad. of Atlanta,* 194 Ga.App. 233, 390 S.E.2d 228, 230 (1989); *Greer v. Columbus Monthly Publ'g Corp.,* 4 Ohio App.3d 235, 4 O.B.R. 426, 448 N.E.2d 157, 162 (1982). Hence, while Bandido's may not necessarily have been a public figure before the health department closed the restaurant, we find that it certainly became a public figure for the limited purpose of issues concerning the health department's report and the circumstances giving rise to the closing of the restaurant.

## III

■ Bandido's contends that the Court of Appeals exceeded the proper standard of review in determining that there was insufficient evidence to support the jury verdict that the Journal–Gazette published the incorrect subheadline with actual malice. Additionally, Bandido's suggests that the "applicable appellate standard of review in a libel case is whether the evidence and reasonable inferences drawn therefrom support the verdict." Appellee's Br. at 2. The Journal–Gazette contends that the appellate court should undertake an independent and searching review of the record to determine whether Bandido's has met its burden of proof. We agree with the Journal–Gazette.[11]

10. The trial court's instruction stated, in pertinent part: "In this case, the statements upon which suit has been brought relate to a limited purpose public figure as well as a mater of public interest at least for the purpose of the statements at issue." (R. at 850.)

11. Because Bandido's is a public figure, *see* Part II, *supra,* we do not address the appellate standard of review to be employed in reviewing a judgment in a defamation case involving matters

In *New York Times*, the United States Supreme Court determined that because proof of actual malice was required for libel actions brought by public official plaintiffs, effective judicial administration required review of the entire record to determine whether the evidence could constitutionally support a judgment. 376 U.S. at 285, 84 S.Ct. 710. Additionally, the Court made the following comments:

> This Court's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. This is such a case, particularly since the question is one of alleged trespass across "the line between speech unconditionally guaranteed and speech which may legitimately be regulated." In cases where that line must be drawn, the rule is that we "examine for ourselves the statements in issue and the circumstances under which they were made to see ... whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect." We must "make an independent examination of the whole record," so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression.

*Id.* (omission in original) (citations omitted). In *Rosenbloom*, the Court emphasized that it "has an 'obligation to test challenged judgments against the guarantees of the First and Fourteenth Amendments,' and in doing so '[it] cannot avoid making an independent constitutional judgment on the facts of the case.'" *Rosenbloom*, 403 U.S. at 54, 91 S.Ct. 1811 (quoting *Jacobellis v. Ohio*, 378 U.S. 184, 190, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (alteration added)). "The simple fact is that First Amendment questions of 'constitutional fact' compel this Court's de novo review." *Id.; see also Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (quoting *New York Times*, 376 U.S., at 284–86, 84 S.Ct. 710, and citing *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 933–34, 102

S.Ct. 3409, 73 L.Ed.2d 1215 (1982); *Greenbelt Cooperative Publ'g Ass'n v. Bresler*, 398 U.S. 6, 11, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); *St. Amant v. Thompson*, 390 U.S. 727, 732–33, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)) (In cases raising First Amendment issues, "an appellate court has an obligation to 'make an independent examination of the whole record.'").

In justifying the use of an independent examination, the Supreme Court stated that "the rule of independent review assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact, whether the factfinding function be performed in the particular case by a jury or by a trial judge." *Bose Corp.*, 466 U.S. at 501, 104 S.Ct. 1949.

The requirement of independent appellate review reiterated in *New York Times Co. v. Sullivan* is a rule of federal constitutional law. It emerged from the exigency of deciding concrete cases; it is law in its purest form under our common law heritage. It reflects a deeply held conviction that judges—and particularly Members of this Court—must exercise such review in order to preserve the precious liberties established and ordained by the Constitution. The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice."

*Bose Corp.*, 466 U.S. at 510–11, 104 S.Ct. 1949. This principle was recently reaffirmed by a unanimous Court in *Hurley v. Irish–American Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557, 567, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995).

We believe the language in the cases cited *supra* indicates that the Supreme Court has mandated that appellate courts use independent examination of the whole record as the

of public or general concern and a private individual plaintiff.

standard of review when proof of actual malice is required as a matter of federal constitutional law in defamation cases.

## IV

■ In the final part of our analysis, we must review the evidence to determine whether there was sufficient evidence to support a finding of actual malice. We hold that the evidence was insufficient.

■ Actual malice must be shown by clear and convincing evidence. *Heeb v. Smith,* 613 N.E.2d 416, 419 (Ind.Ct.App. 1993) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *see Rosenbloom,* 403 U.S. at 52, 91 S.Ct. 1811. Actual malice exists when the defendant publishes a defamatory statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times,* 376 U.S. at 279–80, 84 S.Ct. 710; *see Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 510, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991); *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 659, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989); *Gertz,* 418 U.S. at 342, 94 S.Ct. 2997; *Rosenbloom,* 403 U.S. at 52, 91 S.Ct. 1811; *Curtis Publ'g Co.,* 388 U.S. at 134, 87 S.Ct. 1975. "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant,* 390 U.S. at 731, 88 S.Ct. 1323. To demonstrate reckless disregard, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication," *id.,* or proof that the false publication was made with a "high degree of awareness of their probable falsity," *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); *see Masson,* 501 U.S. at 510, 111 S.Ct. 2419; *Harte–Hanks Communications,* 491 U.S. at 668, 109 S.Ct. 2678. Hence, a defendant's actual state of mind is a critical factor in the analysis. *See Herbert v. Lando,* 441 U.S. 153, 160, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979); *see also Woods v. Evansville Press Co.,* 791 F.2d 480, 485 (7th Cir.1986); *Long v. Arcell,* 618 F.2d 1145, 1147 (5th Cir.1980). A defendant's state of mind is a subjective fact and may be shown by indirect or circumstantial evidence. *See Zerangue v. TSP Newspapers,* 814 F.2d 1066, 1070 (5th Cir.1987) (citing *Herbert v. Lando,* 441 U.S. 153, 165, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979)); *Harte–Hanks Communications,* 491 U.S. at 668, 109 S.Ct. 2678.

■ The question of whether there is sufficient evidence to support a finding of actual malice is a question of law to be determined by the court. *See Harte–Hanks Communications,* 491 U.S. at 685, 109 S.Ct. 2678 (citing *Bose Corp.,* 466 U.S. at 510–11, 104 S.Ct. 1949). This rule is premised on two important considerations: (1) the "national commitment to the free exchange of ideas, as enshrined in the First Amendment;" and (2) the recognition that " '[j]udges as expositors of the Constitution' have a duty to 'independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice." ' " *Id.* at 686, 109 S.Ct. 2678 (quoting *Bose Corp.,* 466 U.S. at 511, 104 S.Ct. 1949 (alteration in original)). We discussed *supra* in Part III the need to conduct an examination of "the factual record in full." *Id.* at 688, 109 S.Ct. 2678. In an independent review, each piece of evidence may be considered cumulatively. *See id.* at 689, 109 S.Ct. 2678.

Bandido's contends that there were five significant pieces of evidence indicating that the Journal–Gazette published the inaccurate newspaper subheadline with actual malice: (1) printing a subheadline using the word "rats"; (2) a warning provided by the Allen Superior Court when it ruled "that public disclosure of the inspection reports might result in improper inferences or interpretations as to the seriousness of the violations noted;" (3) job evaluations of two Journal–Gazette employees; (4) the Journal–Gazette's failure to publish a retraction in accordance with Ind.Code § 34–4–15–1; and (5) the subheadline appeared in the first and final editions of the Journal–Gazette, but not in the second edition. We review each piece of evidence to determine whether any of these items alone shows by clear and convincing evidence that the Journal–Gazette acted with

actual malice or whether the evidence cumulatively suggests actual malice.

## A

 It is a question of law for the court to decide whether a statement considered in its entirety is capable of possessing a defamatory meaning or implication. *Woods,* 791 F.2d at 486 (citing *Rose v. Indianapolis Newspapers, Inc.,* 213 F.2d 227, 229 (7th Cir.1954)). If a statement is susceptible to both defamatory and non-defamatory meanings, the matter of interpretation should be left to the jury. *Id.* In order to impose liability for defamation, the United States Constitution requires a false statement of fact. *Heeb,* 613 N.E.2d at 421 (citing *Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988)); *see Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 776, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (noting that a statement on matters of public concern must be provable as false before there can be liability under state defamation law). "[T]he statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Masson,* 501 U.S. at 517, 111 S.Ct. 2419 (quoting R. Sack, *Libel, Slander, and Related Problems* 138 (1980)); *see Heeb,* 613 N.E.2d at 421 (citing *AIDS Counseling & Testing Centers v. Group W Television, Inc.,* 903 F.2d 1000 (4th Cir.1990)) ("The test for determining whether a statement is substantially true is whether any inaccuracies caused the statement to produce a different effect on the audience than would have been produced had the literal truth been spoken."); *Cochran,* 372 N.E.2d at 1217 ("In determining whether a defamatory meaning is possible, the test is the effect which the article is fairly calculated to produce and impression it would naturally engender in the mind of the average person."); *McIlvain v. Jacobs,* 794 S.W.2d 14, 16 (Tex.1990) (Substantial truth is an absolute defense in defamation actions and the test is "whether the alleged defamatory statement was more damaging to [plaintiff's] reputation, in the mind of the average listener, than a truthful statement would have been.").

### A-1

Our first inquiry is to decide whether the subheadline and the article should be read together or independently in order to determine whether the subheadline was defamatory.

Both Bandido's and the Journal–Gazette rely on *Sprouse v. Clay Communication, Inc.,* 158 W.Va. 427, 211 S.E.2d 674 (1975), as authority for the determination of whether the subheadline and the article should be read together or separately. In *Sprouse,* the court made the following statements:

> Generally where the headline is of normal size and does not lead to a conclusion totally unsupported in the body of the story, both headlines and story should be considered together for their total impression. However, where oversized headlines are published which reasonably lead the average reader to an entirely different conclusion than the facts recited in the body of the story, *and* where the plaintiff can demonstrate that it was the intent of the publisher to use such misleading headlines to create a false impression on the normal reader, the headlines may be considered separately with regard to whether a known falsehood was published.

*Id.* at 686 (emphasis added).

The *Sprouse* court viewed the headline independently of the article but emphasized that its reason for doing so was "because the plaintiff proved that the newspaper abdicated its traditional role of fairly reporting the news and became a participant in a scheme or plan, the object of which was to employ grossly exaggerated and patently untrue assertions, embodied primarily in headlines, to destroy the character of Sprouse." *Id.* at 691. In this case, there is no evidence that the Journal–Gazette engaged in such conduct.

 "The majority of jurisdictions support the rule that headlines are to be construed in conjunction with their accompanying articles." *Molin v. Trentonian,* 297 N.J.Super. 153, 687 A.2d 1022, 1024 (1997) (citing cases). However, there are some

jurisdictions which hold that a newspaper headline alone is libelous. *See, e.g., Las Vegas Sun, Inc. v. Franklin,* 74 Nev. 282, 329 P.2d 867, 870 (Nev.1958) (Because the "public frequently reads only the headline," the headline may be construed apart from its accompanying article.). Some minority jurisdictions have adopted what is known as the "fair index" rule. *See Burgess v. Reformer Publ'g Corp.,* 146 Vt. 612, 508 A.2d 1359, 1363 (1986); *Schermerhorn v. Rosenberg,* 73 A.D.2d 276, 426 N.Y.S.2d 274, 283 (1980); *Hein v. Lacy,* 228 Kan. 249, 616 P.2d 277, 286 (1980); *Bray v. Providence Journal Co.,* 101 R.I. 111, 220 A.2d 531, 535 (1966). Under the fair index rule:

> "If the headline is a fair index of an accurate article, it is not actionable. If it is not a fair index [—does not fairly indicate the substance of the matter to which it refers—] then the headline must be examined independently to determine whether it is actionable under general principles of libel."

*Burgess,* 508 A.2d at 1363 (quoting *Schermerhorn,* 426 N.Y.S.2d at 283 (alteration in original)). In deciding to follow the fair index rule, the *Burgess* court remarked that it "cannot ignore the fact that 'many people in a hurried and busy society are headline readers,' " *id.* (quoting *Cross v. Guy Gannett Publ'g Co.,* 151 Me. 491, 121 A.2d 355, 358 (1956)), and that "[a]lthough 'the defamatory meaning of the headline may be dispelled by a reading of the entire article ..., [a] headline is often all that is read by the casual reader and therefore separately carries a potential for injury as great as any other false publication,' " *id.* (quoting *Schermer-*

*horn,* 426 N.Y.S.2d at 283 (second alteration in original));[12] *see Reardon v. News-Journal Co.,* 53 Del. 29, 164 A.2d 263, 265 (Del. 1960) ("[T]he sting of a libel may sometimes be contained in a word or sentence used in a headline to the body of the article, even though the facts are correctly set forth in the body.").

We agree with the minority of jurisdictions that follow the "fair index" rule for the reasons mentioned herein and adopt this approach when determining whether a headline is defamatory. We believe this to be the best approach because in many respects, a defamatory headline may be much more injurious to a party than a defamatory article where the false statement may be buried in the story and go unnoticed by the average reader. This is especially true when an individual reads only the headline and not the story. In Indiana, a defamatory headline will be actionable even if the story following it is accurate, unless the headline is a fair index of the accurate article. "[I]n determining whether a headline fairly indicates substance of the matter to which it refers, the headline and article must be considered together." *Burgess,* 508 A.2d at 1363.

The headline in this case read: "Health Board Shuts Doors of Bandido's" and the subheadline read: "Inspectors find rats, roaches at local eatery."[13] One interpretation, and perhaps the most logical, of the subheadline is that Bandido's was shut down because the health board found rats and roaches (or bugs) at the restaurant. The article which has been deemed to be accurate states that the restaurant was closed

---

**12.** The *Burgess* court also agreed with the following comments made by the court in *Black v. Nashville Banner Publishing Co.,* 24 Tenn.App. 137, 141 S.W.2d 908 (1939):

"The headline of an article or paragraph, being so conspicuous as to attract the attention of persons who look casually over a paper without carefully reading all its contents, may in itself inflict very serious injury upon a person, both because it may be the only part of the article which is read, and because it may cast a graver imputation than all the other words following it. There is no doubt that in publications ... claimed to be libelous, the headlines directing attention to the publication may be considered as a part of it, and may even justify

a court or jury in regarding the publication as libelous when the body of the article is not necessarily so."

*Burgess,* 508 A.2d at 1363 (quoting *Black,* 141 S.W.2d at 912 (omission in original)).

**13.** This is how the subheadline read in the first edition. As mentioned earlier, the subheadline was deleted from the second edition and the third edition contained the following subheadline: "Investigators finds rats, bugs at north-side eatery." We do acknowledge that the headline as published is in bold type face and oversized and the subheadline, while smaller than the headline, is somewhat larger than the text of the article.

"because of health violations including evidence of insects and rodents." The article goes on to mention some of the significant violations cited by the health board. The subheadline clearly creates the impression that Bandido's was closed solely because of the discovery of rats [14] and roaches (or bugs) and in addition, conjures up a depiction of the restaurant which is not entirely accurate.[15] As such, we are hard pressed to conclude that the subheadline was a fair index of the story. Consequently, we examine the subheadline independently to determine whether the subheadline is defamatory and actionable under libel principles.[16]

### A–2

To determine whether the subheadline is defamatory, we must decide whether the substitution of the word "rats" for "rodents" was false. Webster's New World Dictionary (3d ed.1988) defines rodent as "any of a very large order (Rodentia) of gnawing mammals including rats, mice, squirrels, beavers, etc., characterized by constantly growing incisors adapted for gnawing or nibbling; esp., *in popular usage, a rat or mouse.*" (emphasis added). Rat is defined as "any of numerous long-tailed rodents ..., resembling, but larger than, the mouse; ... rats are very destructive pests and carriers of highly contagious disease, as bubonic plague, typhus, etc." *Id.* As indicated by the definition, every rat is a rodent although every rodent is not necessarily a rat. Rodent is a more generic term whereas rat denominates a specific type of rodent.

During trial, Bandido's contended that if the headline had used the words "evidence of rodent droppings" instead of "rats," there would be no dispute and the impact would not have been nearly the same.[17] (R. at 1346.) During the direct examination of June Remley, author of the article and *not* the subheadline, Bandido's had the witness

---

14. The subheadline's reference to the discovery of rats in and of itself is not entirely accurate, but is at least substantially true. See *infra* Part A–2 for a discussion of this issue.

15. Jan Ashburn, a witness for Bandido's, provided the following testimony when asked what her reaction to the subheadline was:

> Uh, I was, uh, in shock and I was really upset thinking about rats. I envisioned rats running through. I envisioned sitting at a restaurant much like, uh, as I say in my deposition, I've done some, uh, quite a bit of traveling, so I envisioned some, some places that we have been in some third world countries where there was just, uh, you couldn't eat a meal because of, of the bugs and the filthy conditions. And so that's what I, when I looked at the headline that's what I envisioned. Was just completely filthy conditions. With rats, I equate rats with, with filth.

(R. at 1991.) Beverly Zuber, another witness for Bandido's, testified that when she read the subheadline, she "was appalled" and "imagined bowls [of] white rice and rats jumping from bowl to bowl." (R. at 2014.)

16. We note that in *Woodcock v. Journal Publishing Co.*, 230 Conn. 525, 646 A.2d 92, 106 (1994), the plaintiff alleged that a subheadline was libelous because it indicated that a developer who benefited by plaintiff's proposal was a business associate whereas the truth was that the developer had a business relationship with other members of plaintiff's family. The court determined that the inaccuracy was clarified in the first paragraph of the article and that although the subheadline mischaracterized the relationship between the plaintiff and the developer, it was "not libelous as a matter of law in view of the accompanying clarification." Similarly, in *Contemporary Mission, Inc. v. New York Times, Co.*, 842 F.2d 612, 624–25 (2d Cir.1988), a subheadline inaccurately stated that certain priests' ordinations were forged when the truth was that the documentation supporting the ordinations had been forged. The court determined that even though the subheadline mischaracterized the controversy, the subheadline was followed by the article which accurately clarified the subheadline and thus held that the statement was not defamatory.

17. After an in depth cross-examination of Mr. Schindler, the owner of Bandido's restaurant, regarding all the health violations of the restaurant in recent years and the other violations noted by the Board of Health in the September 13, 1988, inspection which discovered the evidence of rodent droppings, the following colloquy occurred:

> Q: Alright. Don't you think, Sir, that those are all things that might influence whether or not people want to eat in a restaurant?
> A: I don't think it would have near the impact as rat headline, if that's the question.
> Q: So you think you'd been a lot better off if the headline wouldn't sai—, would have said, inspectors find rodent droppings, roaches at local eatery?
> A: Uh, they didn't find it. It would be mis—, it would still be wrong. Read the report. On the back it says "evidence of". They never found the first one.

**460**

agree that the word "rat" connotes dirtiness, filth, pestilence, disease, infection, and plague.[18] (R. at 1609.)[19] We would agree that the word "rat" connotes such ideas and find that the definition of rat supports such a belief. However, we do not agree that use of the word "rat" is so distasteful that it created an impression that was so different than would have been created had the Journal–Gazette used the words "evidence of rodents" or "evidence of rodent droppings." *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (providing that a "false" statement will have a different effect on the reader's mind).

One might say that the word "rat" is common usage for the more proper term "rodent" or that "rat" is often used in colloquial speech to refer to "rodent."[20] *See Simonson v. United Press Int'l, Inc.*, 654 F.2d 478, 481, 482 (7th Cir.1981) (determining that " 'rape' as defined by common usage is incorporated into second-degree sexual assault under Wisconsin law" and the publica-

tions "were in no manner made false by substituting the word in common usage for an exact legalism") (footnote omitted); *Orr v. Argus–Press Co.*, 586 F.2d 1108, 1112 (6th Cir.1978) (conceding that while use of the "word 'swindle' may imply more serious wrongdoing than was involved . . . , the word is frequently used in colloquial speech as a substitute for 'defraud' ").

Clearly, if the subheadline had read "investigators find evidence of rodents," the average reader would infer that there were rodents in the restaurant.[21] Ordinarily, only two types of rodents are perceived as habitating in a restaurant—rats and mice. Thus, if the subheadline had used the words "evidence of rodents" and the average reader inferred from this that the restaurant contained rodents, then the average reader would just as likely conclude that there must be either mice or rats in the restaurant.[22] We doubt that the use of the word "mice" in the subheadline would have been less damaging than use of the word "rats."[23] Addition-

(R. at 1346.)

18. When asked whether she could think of anything by way of connotation from rat that is nice, June Remley responded, "Well, sir, I'm aware that some people do keep them as pets so in some circles they are considered very acceptable pets." (R. at 1609.)

19. June Remley's deposition was read into the record with another witness reading her responses.

20. We take judicial notice that the words "rats" and "rodents" are frequently used interchangeably. *See, e.g.,* Lynn Snowden, *Attack of the Giant Rats,* George, July, 1998, at 90, 92 ("[C]onditions for rodents were so favorable that a rat blithely wandered up to Mayor Rudolph Giuliani. . . . [T]he mayor announced the $8 million Comprehensive Rodent Control Initiative, an all-out war against rats.").

21. *See Zerangue v. TSP Newspapers, Inc.,* 814 F.2d 1066, 1073 (5th Cir.1987) ("In determining whether the gist and sting of a story is true, the court must view the story through the eyes of the average reader or member of the audience."); *Molin v. Trentonian,* 297 N.J.Super. 153, 687 A.2d 1022, 1023 (1997) (In determining whether a statement is defamatory, one "must evaluate the language in question 'according to the fair and natural meaning which would be given it by reasonable persons of ordinary intelligence.' ")

(quoting *Herrmann v. Newark Morning Ledger Co.,* 48 N.J.Super. 420, 138 A.2d 61 (1958)).

22. During a deposition, one of Bandido's witnesses stated that when she hears the term "rodents," she thinks of rats. (R. at 2018.) Another Bandido's witness stated during a deposition which was admitted at trial that when she sees the word "rodents," she thinks of mice; however, even if the headline had used the word "rodents," she still would not have gone back to the restaurant. (R. at 2024.)

23. At trial, Bandido's admitted into evidence its October 18, 1988, letter to the Journal–Gazette expressing dissatisfaction with the Journal–Gazette's follow-up correction story. In the letter, Bandido's alleged that if the Journal–Gazette had interviewed inspectors at the Board of Health, it would have discovered that "as a matter of course, use of the term 'rodents' means 'mice' and use of the term 'rats' means 'rats.' " (R. at 1272.) At trial, Bandido's often used the words "rodent" and "mice" interchangeably, (R. at 1450), and even tried to elicit testimony suggesting that a headline using the word "mice" would have been far less damaging. (R. at 1227.) Bandido's called the health inspector who observed the Bandido's restaurant on October 4, 1988, in order to gather information for the revocation hearing testified at trial. The inspector testified that before inspecting Bandido's, she reviewed the September 13, 1988, health inspection report which noted the discovery of "evidence of rodent droppings" and talked with the inspectors who

ally, we believe that had the Journal–Gazette used the word "rodents" in the subheadline, it would have created substantially the same effect on a reader as was created with use of the word "rats."[24] Either way, readers would have perceived Bandido's as an unsanitary, dirty restaurant. *See, e.g., Woodcock v. Journal Publ'g Co.*, 230 Conn. 525, 646 A.2d 92, 106 (1994) ("[T]he absolute truth—that [the developer] was a business associate of other members of the plaintiff's family, rather than of the plaintiff herself—would have had the same effect on the reader as the inaccurate subheadlines" in that "[e]ither way, the reader would have perceived that the plaintiff had a conflict of interest."); *Zerangue*, 814 F.2d at 1074 (In citing to numerous cases where a publisher had printed an inaccurate but substantially true article, the court determined that the "common thread" running through the cases was that while the defendant newspaper reported the substance of the criminal proceedings, the defendant erred in the use of legal terminology and that the average person would likely characterize the mistakes as a "technicality" and if the story had been free of error, the plaintiffs "would have been exposed to roughly the same amount of community opprobrium."). While admittedly the word "rat" conjures up more bad connotations than "mice" does (or "rodents" for that matter), the sting of this inaccuracy was sufficiently similar to the gist of the truth—Bandido's was closed and the inspectors did find evidence of rodents and evidence of rodent droppings in the restrooms. *See Chapin v. Knight–Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir.1993) ("The falsity of a statement and the defamatory

'sting' of the publication must coincide—that is, where the alleged defamatory 'sting' arises from substantially true facts, the plaintiff may not rely on minor or irrelevant inaccuracies to state a claim for libel."). In this respect, we believe the inaccuracy did not create a falsehood, but rather was substantially true.

Whatever distinction one might draw between a rat and rodent, we believe the difference "fits easily within the breathing space that gives life to the First Amendment." *Bose Corp.*, 466 U.S. at 513, 104 S.Ct. 1949. Even if we were to assume that the inaccuracy conceded to by the Journal–Gazette created a falsehood, "[s]ome degree of abuse is inseparable from the proper use of everything; and in no instance is this more true than in that of the press." *Gertz*, 418 U.S. at 340, 94 S.Ct. 2997. "The First Amendment requires that we protect some falsehood in order to protect speech that matters." *Id.* at 341, 94 S.Ct. 2997. "'[T]o insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones.'" *Rosenbloom*, 403 U.S. at 51–52, 91 S.Ct. 1811 (quoting *St. Amant*, 390 U.S. at 732, 88 S.Ct. 1323 (alteration in original)).

All that being said, we do not rest our decision in this case on the basis that the subheadline was substantially true. *See St. Amant*, 390 U.S. at 730–31, 88 S.Ct. 1323 ("'Reckless disregard,' it is true, cannot be fully encompassed in one infallible definition. Inevitably its outer limits will be marked out through case-by-case adjudication, as is true

did the report. The conversation revealed that the rodent droppings were small and indicative of mouse droppings instead of rat droppings which are much larger. (R. at 1533.) Bandido's contends that if the Journal–Gazette had spoken with these inspectors, it would have uncovered this truth. Without delving into the merits of this claim, we simply state that numerous courts have determined that the failure to investigate or verify facts is not sufficient evidence of actual malice. *See Chester v. Indianapolis Newspapers*, 553 N.E.2d 137, 140 (Ind.Ct.App.1990); *see also St. Amant v. Thompson*, 390 U.S. 727, 733, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 84, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967); *New York Times Co. v. Sullivan*, 376 U.S. 254, 287, 84 S.Ct.

710, 11 L.Ed.2d 686 (1964); *Herbert v. Lando*, 781 F.2d 298, 308 (2d Cir.1986); *Bartimo v. Horsemen's Benevolent & Protective Ass'n*, 771 F.2d 894, 898 (5th Cir.1985); *McDowell v. Paiewonsky*, 769 F.2d 942, 951 (3d Cir.1985); *Smith v. A. Pocono*, 686 F.Supp. 1053, 1061 (M.D.Pa. 1987); *Live Oak Publ'g Co. v. Cohagan*, 234 Cal. App.3d 1277, 286 Cal.Rptr. 198, 205 (1991); *Tagawa v. Maui Publ'g Co.*, 50 Haw. 648, 448 P.2d 337, 340 (1968); *Sweeney v. Prisoners' Legal Servs.*, 84 N.Y.2d 786, 622 N.Y.S.2d 896, 647 N.E.2d 101, 104 (1995).

**24.** We acknowledge that one of Bandido's expert witnesses, Professor Dennis Hale, who teaches Journalism testified that "the word 'rats' is much more damaging, much more threatening. The

with so many legal standards for judging concrete cases, whether the standard is provided by the Constitution, statutes, or case law."). For this reason, we examine the evidence which Bandido's contends proves that the Journal–Gazette published the subheadline with actual malice.

### B

Bandido's most compelling piece of evidence that the Journal–Gazette acted with actual malice is the Journal–Gazette's use of the word "rats" instead of "rodents" in the subheadline. Bandido's contends that because the word "rats" does not appear in the article, the mere fact that the word "rats" was erroneously used in the subheadline was more than an extreme departure from normal professional standards and in fact is indicative of actual malice.[25] We disagree with Bandido's.[26]

■ Contrary to Bandido's assertion, "[m]alice cannot be deduced from the mere fact of publication alone." *LaBruzzo v. Associated Press*, 353 F.Supp. 979, 985 (W.D.Mo. 1973) (citing *Hurley v. Northwest Publications, Inc.*, 273 F.Supp. 967 (D.Minn.1967)). Consequently, Bandido's cannot rely solely on the fact that there is a variance between what the article reported the health inspector

found and what the Journal–Gazette printed in the subheadline as proof of actual malice. *See Hodges v. Oklahoma Journal Publ'g Co.*, 617 P.2d 191, 196 (Okla.1980) ("[W]here there was no evidence that the publisher intended or was aware of a potentially defamatory meaning of an article, which meaning was admittedly at variance with the known truth, 'malice' as required by *New York Times* ... could not be inferred.") (citing *Tilton v. Cowles Publ'g Co.*, 76 Wash.2d 707, 459 P.2d 8 (1969)). As suggested *supra*, Bandido's must show that the Journal–Gazette was aware of the inaccuracy at the time of publication or had serious doubts as to its accuracy. Bandido's has failed in this regard.

■ During trial, Sheila Pinkley, the author of the headline, testified that she thought the headline was accurate.[27] She stated, "Well, at the time I thought it was accurate. A rat is a rodent. Um, if I would have just said rodent, that would have been accurate. So, to me, a rodent suggested rat. And it, that is why I wrote the word 'rat.'" (R. at 2478.) There was no other evidence reflecting Pinckley's state of mind or whether she "entertained serious doubts as to the truth of the headline" or had a "high degree of awareness" of the headline's probable falsity. Our research has revealed several

word 'rodents' is more general, uh, vague, simply as, not as potentially derogatory." (R. at 1964.)

**25.** During trial, Bandido's attempted to show that the Journal–Gazette had a general rule that for a word to appear in a headline, the word must appear in the article. According to Bandido's, the failure to apply this rule is proof that the Journal–Gazette departed from its professional standards. However, we find that even if the Journal–Gazette did maintain such a rule (and the record appears to reflect that it did), the Journal–Gazette's failure to apply the rule in this case may be evidence of an extreme departure from professional standards, but is not evidence of actual malice. *See Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 665, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (The *New York Times* actual malice standard plainly requires a public figure plaintiff to "prove more than an extreme departure from professional standards."); *see also Travelers Indem. Co. v. Armstrong*, 442 N.E.2d 349, 362 (Ind.1982).

**26.** In its brief to this Court, Bandido's states that the evidence at trial showed that the Journal–Gazette's publication of the headline was an "extremely careless error." (Appellee's Br. at 5–6.)

Careless error is not the equivalent of actual malice.

**27.** Testimony by a defendant that he or she published in good faith or believed the publication to be true is not sufficient to dispel the notion that the defendant acted with actual malice. *See St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) ("The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true.").

In *St. Amant*, the Court set forth several circumstances in which profession of a good faith by the defendant would not be persuasive: (1) where a story is fabricated by the defendant; (2) where the story is the product of defendant's imagination; (3) where the story is based wholly on an unverified anonymous telephone call; (4) where the defendant's allegations are so inherently improbable that only a reckless person would have put them in circulation; and (5) where there are obvious reasons to doubt the veracity of the informant or the accuracy of the informant's reports. *Id.*, 88 S.Ct. 1323. The

cases in which courts have determined that use of an inaccurate word as a result of a misconception or poor interpretation is not actual malice. We find the following cases particularly instructive.

In *Time, Inc. v. Pape*, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971), a news magazine reported on the Commission on Civil Rights Report entitled "Justice." A part of the Commission's Report described an alleged incident of police brutality. When the magazine published an article, it quoted the summary of the complaint but left out the word "alleged." This created the impression that the facts described in the Commission's Report were indeed true. *Id.* at 282–83, 91 S.Ct. 633. The detective who was the target of the police brutality complaint filed a libel suit. The author of the article testified that he knew the meanings of the words "alleged" and "complaint" and the researcher testified that she was aware of the omission of the word "alleged" in the article, but believed the article to have been true as written. *Id.* at 283, 91 S.Ct. 633. The Supreme Court determined that under the totality of the circumstances, the failure to mention that the incident described in the Commission's Report was based on an allegation was not a "falsification" sufficient to sustain a jury finding of "actual malice."[28] *Id.* at 289, 91 S.Ct. 633. The Court continued by stating that "Time's omission of the word 'alleged' amounted to the adoption of one of a number of possible rational interpretations of a document that bristled with ambiguities. The deliberate choice of such an interpretation, though arguably reflecting a misconception, was not enough to create a jury issue of 'malice' under *New York Times*." *Id.* at 290, 91 S.Ct.

633. "We have held that if 'the freedoms of expression are to have the breathing space that they need . . . to survive,' misstatements of this kind must have the protection of the First and Fourteenth Amendments." *Id.* at 292, 91 S.Ct. 633 (quoting *New York Times*, 376 U.S. at 271–72, 84 S.Ct. 710) (internal quotation marks omitted).

In *Bose Corp. v. Consumers Union of United States, Inc.*, an engineer for a consumer product testing organization prepared a report on a loudspeaker system suggesting that instruments had a tendency to "wander about the room." 466 U.S. at 493, 104 S.Ct. 1949. At trial, it became clear that what the engineer really perceived was that the sound wandered "along the wall," although the engineer refused to admit that there was any inaccuracy in his description.[29] The trial court concluded that it was impossible "to believe that [the engineer] interprets a commonplace word such as 'about' to mean anything other than its plain ordinary meaning." *Id.* at 487, 104 S.Ct. 1949. Relying on *Time, Inc., v. Pape*, the *Bose* Court determined that the engineer's "choice of such language, though reflecting a misconception, does not place the speech beyond the outer limits of the First Amendment's broad protective umbrella." *Id.* at 513, 104 S.Ct. 1949. The Court additionally stated that this case "represents the sort of inaccuracy that is commonplace in the forum of robust debate to which the *New York Times* rule applies." *Id.; see Chester*, 553 N.E.2d at 140 (A negligent interpretation of public records or misconstruction of a statement from a person interviewed falls short of the constitutional requirement of actual malice.).

circumstances of this case do not fall within any of the scenarios mentioned in *St. Amant*.

**28.** The Court also supported its conclusion with the following comments:

The author of the Time article testified, in substance, that the context of the report of the [police brutality] incident indicated to him that the Commission believed that the incident had occurred as described. He therefore denied that he had falsified the report when he omitted the word "alleged." The Time researcher, who had read newspaper stories about the incident and two reports from a Time reporter in Chicago, as well as the accounts of [the police detective's] earlier career, had even

more reason to suppose that the Commission took the charges to be true.

*Time,* 401 U.S. at 289, 91 S.Ct. 633.

**29.** The Court made the following comments with respect to the engineer's refusal to admit his mistake:

"[The engineer] displayed a capacity for rationalization. He had made a mistake and when confronted with it, he refused to admit it and steadfastly attempted to maintain that no mistake had been made—that the inaccurate was accurate. That attempt failed, but the fact that he made the attempt does not establish that he realized the inaccuracy at the time of publication."

The circumstances in *Schwartz v. Worrall Publications, Inc.*, 258 N.J.Super. 493, 610 A.2d 425 (1992),[30] are somewhat similar to the circumstances of the case at hand. In *Schwartz*, a reporter wrote a story on the investigation of a school board association. After completing the story, the reporter left it with the copy editor and then left town. The copy editor found the article to be confusing and after reading it several times, thought he "knew what [the writer] was trying to say." *Id.* at 427. The editor revised the article in the mistaken belief that the attorney of the school board association was the target of the investigation. The editor provided the following explanation:

> I was under the assumption that because there was a local angle, that the reason the story was being written was that the local person was the gist of the story.... I was confused. So in my confusion, I saw a local person; and I assumed that oh, this local person must be the primary focus of the story and I was trying to simplify it.

*Id.* The editor never spoke with the writer during the editing process even though there was opportunity to do so and also did not have access to the information upon which the writer relied in drafting the story. The court determined that a review of the record revealed "no indication that anyone at [the newspaper] knew that the facts being published were false." *Id.* at 429. Additionally, the court commented that while the record "would justify a finding of an irresponsible and uncaring attitude on [the newspaper's] part," *id.*, this was not the same as reckless disregard, since there must be clear and convincing proof that the statements were published with a "high degree of awareness of their probable falsity," or with "serious doubts as to the truth of [the] publication," *id.* at 430 (citations omitted) (alteration in original).[31]

In *Woodcock v. Journal Publishing Co.*, 230 Conn. 525, 646 A.2d 92, 98 (1994), a newspaper printed an inaccurate subheadline. The subheadline read: "Developer claims Woodcock aim to aid business associate." *Id.* at 95. The author of the article admitted that this statement was inaccurate, but that he did not write the subheadline. He also testified that "the author of the subheadlines could conclude that they were accurate because of the reference in the story to ... business connections with the Woodcock family." *Id.* at 98. The court concluded that "[b]ecause the record fails to reveal anything that would have caused the author of the subheadlines to '[entertain] serious doubts as to the truth of [the subheadlines]'; we cannot say that it has been demonstrated with convincing clarity that the subheadlines were prepared or printed with actual malice." *Id.* (citation omitted) (second and third alterations in original). Additionally, the court commented that the "most that can be said of the inaccurate subheadlines is that the defendants were negligent in their preparation and publication." *Id.* " '[A] merely negligent misstatement of fact about a public official retains the constitutional protection afforded free expression.' " *Id.* (quoting *Holbrook v. Casazza*, 204 Conn. 336, 528 A.2d 774, 779 (1987)).

We similarly believe that while the Journal–Gazette may have exhibited an "irresponsible and uncaring attitude" in meeting its goal of accuracy, the evidence did not demonstrate awareness of the inaccuracy in the subheadline. Pinkley (author of the headline) testified that she spent "ten minutes tops" reading the article prior to writing the headline. She stated that "[w]hen I wrote the headline, I considered them to be accurate." (R. at 24–25.) "I looked at the words rodent droppings and I came up with rats."

---

*Bose Corp.*, 466 U.S. at 512, 104 S.Ct. 1949.

**30.** *Schwartz* was an appeal from the denial of summary judgment for the defendant newspaper.

**31.** The court in *Schwartz* also made the following comments:

> [Plaintiff] presented no evidence to contradict or throw doubt on [the editor's] testimony that, in his haste to edit the article while managing multiple responsibilities, he pared [the writer's] text down to make it more readable, without realizing that his snap conclusions had actually changed the story's intended focus. That explanation does not excuse the unfortunate result, but also does not provide clear and convincing evidence of reckless disregard for the truth.

*Schwartz*, 610 A.2d at 430. Similarly, in this case, Bandido's did not present any evidence at trial disputing the fact that Pinkley truly had the misconception that a rodent is a rat.

(R. at 25.) This evidence indicates nothing more than a misconception. Bill Leonard who was Pinkley's supervisor and responsible for checking the accuracy of her work testified that when editing the story, he did not read it line by line, word for word. He relied on the copy editor, Pinkley, to do those kinds of edits. Leonard also testified that "[t]here was nothing on this story that told me that I should, you know, that we were doing anything wrong in terms of the accuracy or anything. As far as I knew the story was accurate and the headline was accurate." (R. at 42–53.) Leonard also said that he did not observe that the word "rats" did not appear in the story. (R. at 58.) This evidence, while clearly indicating that the Journal–Gazette was careless and negligent, was not indicative of actual malice. Additionally, the article and headline was read by at least three other employees before being published and there is no evidence suggesting that any of these employees had serious doubts about the accuracy of the subheadline or that they were aware that the word "rats" did not appear in the story. While the chances of this mistake occurring after five people had reviewed the story suggests serious quality control concerns, it alone is not sufficient to support a finding of actual malice.[32] *See Chester*, 553 N.E.2d at 140 (" 'The publisher who maintains a standard of care designed to avoid knowing or reckless falsehood must be accorded sufficient assurance that those factual errors which nonetheless occur will not expose him to indeterminate liability.' ") (quoting *Aafco*, 321 N.E.2d at 591).

**32.** When courts have found the defendant to have published statements with actual malice, the evidence has been far more compelling than the evidence presented in this case. *See, e.g., Carson v. Allied News Co.*, 529 F.2d 206 (7th Cir.1976) (The defendant completely fabricated defamatory quotations and printed defamatory allegations which were contradicted by a prior publication which was the source of the article.); *Buckley v. Littell*, 539 F.2d 882, 896 (2d Cir. 1976) (The defendant admitted he did not believe that plaintiff engaged in the conduct alleged in his book.); *Goldwater v. Ginzburg*, 414 F.2d 324, 339 (2d Cir.1969) (The defendant wrote that presidential candidate was mentally ill with knowledge that the statement was false.); *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 157, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (In the course of

## C

Bandido's contends that the Journal–Gazette's failure to heed Judge Sheldon's warning about the dangers inherent in misinterpreting the inspection reports suggests that the Journal–Gazette acted with actual malice. Our review of the record indicates that Bandido's has misinterpreted Judge Sheldon's findings of fact and conclusions of law.

Prior to 1988, inspection reports prepared by the Board of Health were not accessible by the general public in Fort Wayne–Allen County. In order to obtain access to the Food Establishment Inspection Reports, the Journal–Gazette filed a lawsuit against the Board of Health arguing that the reports were public records to which the newspaper was entitled. *Journal–Gazette Co. v. Fort Wayne–Allen County Bd. of Pub. Health*, No. 02D01–CT–8802–302 (Allen Sup.Ct. filed Feb. 26, 1988). On March 1, 1988, Judge Sheldon conducted a hearing in connection with the Journal–Gazette's application for a Preliminary Injunction and Order of Mandate requesting the Board of Health to disclose certain public records. The court ordered the Fort Wayne—Allen County Board of Public Health to disclose all records dealing with the inspection of Allen County restaurants and food establishments because such records were public records within the meaning of Ind.Code § 5–14–3–1 *et. seq.* (R. at 1702.) The court made the following relevant findings which Bandido's interprets as a warning:

> There is no question in the Court's mind that the Defendant, Fort Wayne—Allen

publishing an article accusing an athletic director of conspiring to fix a football game, the magazine recognized the need for a thorough investigation of serious charges and realized that the source of the story was on probation for bad check charges but published the story without viewing the source's notes, without substantial independent support, without interviewing a friend who was allegedly with the source when the defamatory conversation was overheard, and without reviewing the game to see if the source's information was accurate.); *Rinaldi v. Viking Penguin, Inc.*, 52 N.Y.2d 422, 438 N.Y.S.2d 496, 420 N.E.2d 377, 383 (1981) (The editor discovered that allegations in the hardback book were false but failed to correct the book prior to publication in a paperback edition.).

County Board of Public Health, in denying disclosure, acted in good faith and pursued an established policy it had adopted many years ago. Nearly all its concerns, which it suggested were the basis for its policy, were reasonable. For example, there *is* a possibility that public disclosure of the inspection reports might result in improper inferences or interpretations as to the seriousness of the violations noted. However, such policy considerations clearly fall outside the exceptions to disclosure authorized in Section 4 of the Access to Public Records Act.

(R. at 1702.) (emphasis in original). We view these findings to be neither a warning nor the opinion of the court, but instead a recitation of the Board of Public Health's policy reason for not disclosing its inspection reports. Even if were to assume for the sake of argument that this was a warning to the Journal–Gazette, such warning reveals nothing with respect to the newspaper's state of mind when the headline was published. Indeed, Pinkley testified that she never participated in any discussions at the Journal–Gazette relating to the standard of care to be used when dealing with matters concerning restaurants and Board of Public Health inspection reports. Craig Klugman, a news editor, testified that Pinkley was never given any directions or precautions to be taken when dealing with Board of Public Health inspection reports of restaurants. The record also indicates that Leonard was never advised of any limitations, or cautions, that the Journal–Gazette allegedly received from Judge Sheldon. Leonard also testified that he did not give the story more careful consideration than any other story and did not take special precautions to insure that the word "rats" appeared in the story. *Cf. McDowell v. Paiewonsky,* 769 F.2d 942, 951 (3d Cir. 1985) (Where among other things, plaintiff claimed actual malice existed because "several people apparently *warned* defendant to check his facts before making his broadcasts," the court stated that defendant's "failure to verify his facts may have been negligent, but does not rise to the level of actual malice.") (emphasis added). Similarly, even if the court's statements can be construed as

a warning, the Journal–Gazette's failure to check more thoroughly the accuracy of its headline did not rise to the requisite level of actual malice.

### D

Bandido's also contends that job evaluations of Pinkley and Leonard indicate that the newspaper acted with actual malice. At trial, Bandido's introduced the job evaluations of both Pinkley and Leonard. A job evaluation of Pinkley provided the following relevant information:

> While you can write an excellent feature headline, news headlines remain your weak area. You are prone to overuse cliches, and the tone of some headlines comes uncomfortably close to slang ("folks" should be used rarely, for instance). Bill has worked with you on these points and reports some improvement, but your headline performance lacks consistency. There have been instances when you've produced inaccurate heads—and this is something we just can't have. For instance, on a story about the Boeing jet that lost part of its roof over the Pacific, you referred to a jet "crash." That flight did not crash. You are very responsive to redoing a head when you are asked, but you need to work on accuracy and tone in the next review period. Please don't lose your lovely touch for feature heads, however—especially the heads you give to newsmaker stories. Those heads are superb examples of good headline writing.

(R. at 1625.) A performance review of Leonard was also introduced at trial because of its reference to Pinkley. The following statements are relevant:

> You have done good work in the past year in the development of several of the new copy editors. Now its time to concentrate on Sheila [Pinkley], giving her one-on-one feedback sessions at least three times a week. She has potential and needs a guiding hand, particularly in headline writing. Despite all the successes in the headline area, there are still headlines that are

vague, off-target or inappropriate.[33] Sometimes those heads appear when you are in slot; more often they appear on your days off. . . .

(R. at 1632.)

Bandido's contends that this circumstantial evidence reflecting Pinkley's difficulties in writing accurate headlines suggests that the newspaper acted with actual malice when it allowed the headline to be printed. Although not stated in Bandido's brief, we assume based upon the direct examination of Leonard at trial, Bandido's argument is that Leonard acted with actual malice by failing to check more thoroughly Pinkley's work. In other words, since Leonard was at least aware of Pinkley's alleged problem with writing inaccurate headlines,[34] Bandido's contends that Leonard was on notice and should have taken more care in reviewing her work, rather just relying on Pinkley to do her job.

We disagree with Bandido's that this circumstantial evidence rises to the level of actual malice. In *Washington Post Co. v. Keogh*, 365 F.2d 965, 971 (D.C.Cir.1966), an allegedly defamed politician filed an affidavit containing a series of excerpts from various magazine and newspaper articles attempting to demonstrate that the author's " 'reputation for accuracy and veracity' was such 'that mere reliance upon his word is grossly negligent and reckless.' " *Id.* at 969. The newspaper employees filed affidavits indicating there was no evidence causing them to suspect the information contained in the article to be false. *Id.* The court found the unim-

peached newspaper employee depositions dispositive that no genuine issue of facts existed that the article was published with actual knowledge of falsity. Additionally, the court stated that

[p]roof of isolated instances of inaccuracy, therefore, in a 35–year career during which [the author] has published well over 10,000 columns, cannot be accorded significance, since the relevant rule of law contemplates that "erroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the breathing space they need to survive."

*Id.* at 971–72 (quoting *Garrison*, 379 U.S. at 74, 85 S.Ct. 209 (omission in original)). Similarly, we find Pinkley's isolated instances of inaccuracy not to be indicative of whether she was aware of the inaccuracy at the time she wrote the subheadline. Additionally, even if Leonard was aware of Pinkley's suggested problem of writing inaccurate headlines, his decision to rely on her work without checking it more carefully is at most negligent.

### E

Bandido's argues that the Journal–Gazette's failure to retract the subheadline in the manner prescribed by Ind.Code § 34–4–15–1(1988)[35] suggests the Journal–Gazette acted with actual malice. The Court of Appeals appropriately noted that Indiana's retraction statute does not place a duty upon the Journal–Gazette to publish a retraction,

33. Leonard testified that he interpreted the statements to mean that Pinkley's headlines were vague, off-target or inappropriate as opposed to his own. (R. at 1634.)

34. Leonard's testimony suggests that he does not recall ever seeing the job evaluation of Sheila Pinkley. (R. at 1627.) There was also some debate as to whether this was really a job evaluation.

35. Ind.Code § 34–4–15–1 (1988) provides in relevant part:

(b) If it appears at the trial of the action that the article was published or transmitted in good faith, and that its falsity was due to mistake or misapprehension of the facts, the plaintiff in the case is entitled to recover only actual damages if:

(1) full and fair retraction of any factual statement alleged to be false and defamatory was published in the regular issue of the newspaper or transmitted to its members or subscribers by the news service:

(A) within three (3) days by a news service;
(B) within five (5) days, if the newspaper is a daily publication; or
(C) within ten (10) days, if the newspaper is a weekly publication;

after the mistake or misapprehension was brought to the knowledge of the publisher or bureau chief; and
(2) the retraction was published in as conspicuous a place and type as the original item appeared in the newspaper or was transmitted by a news service to all members or subscribers to whom the original item was transmitted.

but only permits a mitigation of damages if the Journal–Gazette had opted to print a retraction in accordance with the specification required in Ind.Code § 34–4–15–1. The Journal–Gazette did in fact publish an article correcting its inaccurate headline and apologized for its mistake. Although the correction did not meet the standards of the Indiana retraction statute, we do not find such failure dispositive of the issue of actual malice.

In *New York Times,* 376 U.S. at 286, 84 S.Ct. 710, after stating that the failure to retract is "not adequate evidence of malice for constitutional purposes," the Court left open the question of "[w]hether or not a failure to retract may ever constitute such evidence." Since *New York Times,* some courts have determined that the failure to retract is not sufficient proof of actual malice whereas other courts have found that a retraction negates proof of actual malice. *See Zerangue,* 814 F.2d at 1071 ("[R]eadiness to retract tends to negate 'actual malice.' "); *Hoffman v. Washington Post Co.,* 433 F.Supp. 600, 604 (D.D.C.1977) (Publication of a retraction of the indisputably inaccurate statement is "significant and tends to negate any inference of actual malice."), *aff'd,* 578 F.2d 442 (D.C.Cir.1978); *Trans World Accounts, Inc. v. Associated Press,* 425 F.Supp. 814, 823 n.6 (N.D.Cal.1977) (Publication of a retraction "may create a large obstacle to plaintiff's efforts to prove actual malice."); *Gonzales v. Hearst Corp.* 930 S.W.2d 275, 277 (Tex.Ct.App.1996) ("Refusal to print a retraction is evidence of an action *after* the publication, but it can lend support to a claim that reckless disregard of knowledge existed at the time of publication.") (emphasis in original).

Under the circumstances of this case, because the Journal–Gazette has admitted

without hesitation from the very beginning that it made a mistake and because it printed a correction story the next day along with an apology, albeit not in compliance with the retraction statute, we find the refusal to print a headline retraction not to be sufficient proof of actual malice.[36]

### F

Lastly, Bandido's argues that the fact that the inaccurate subheadline appeared in the first edition, was removed from the second edition, and then revised and added back into the third edition is proof of actual malice.

We attach no significance to the deletion of the subheadline in the second edition. Publishing the subheadline in all editions would be more probative of malice. In any event, Leonard testified that he was unaware of who made the decision to delete the subheadline from the second edition.[37]

Leonard also testified that he requested a change be made from the first to the third edition. Leonard asked that "local eatery" be changed to "north-side eatery" because he wanted to make a distinction since he "was aware that Bandido's had three restaurants" and wanted the "readers to know that it was not the entire chain." Although Leonard requested the change, he did not re-write the headline. The subheadline in the third edition was also altered from the first edition in that the word "inspector" was substituted for "investigator" and the word "bugs" was substituted for "roaches." Leonard provided no explanation for these changes. Pinkley testified, "Well, I believe if you look at the second line, north side takes up more room than local, so roaches was shortened to bugs." (R. at 2508.) She did not explain why "inspectors" was changed to "investigators," but when asked if there wasn't enough room for

---

**36.** During trial, the Journal–Gazette claimed that its decision not to print a retraction pursuant to the statute was based on its understanding that at least Bandido's first attorney was satisfied with the follow-up story. We make no comment on the reasonableness of the justification provided by the Journal–Gazette. *See Connelly v. Northwest Publications, Inc.,* 448 N.W.2d 901, 905 (Minn.Ct.App.1989) (A failure to retract is not probative evidence of actual malice but instead is evidence that the publisher reasonably

believed that the plaintiff had not been defamed.).

**37.** The Court of Appeals noted that a "plausible explanation is that the item was not as newsworthy in areas serviced by the second edition." *Bandido's,* 672 N.E.2d at 974. We find that another plausible explanation may be that there was less space to publish the article in the second edition and thus the subheadline was removed to make the article fit.

rodents on the first line of the subheadline, she responded, "No, Sir, my testimony is, I looked at the word "rodent" ... "rodent droppings" and I wrote the word "rats." (R. at 2508.) We do not find these changes in any way indicative of malice. Nothing about them suggests that either Pinkley or Leonard were aware or had become aware of the inaccuracy in the subheadline. Neither change required that the article be re-read and neither Pinkley nor Leonard testified that they re-read the article before revising the subheadline.

### Conclusion

Having previously granted transfer, we adopt *Aafco* and hold that both private individuals and public figures must prove actual malice to recover in a defamation suit involving matters of public or general concern. We also hold that Bandido's has failed to prove that Journal–Gazette acted with actual malice and hereby reverse the judgment of the trial court.

SELBY, J., concurs.

BOEHM, J., concurs with separate opinion.

SHEPARD, C.J., dissents with separate opinion in which DICKSON, J., concurs.

DICKSON, J., dissents with separate opinion in which SHEPARD, C.J., concurs.

BOEHM, Justice, concurring.

For the reasons set forth in Justice Sullivan's opinion, I agree that the free flow of ideas and information requires giving the press considerable latitude in reporting on matters of public concern. Specifically, I agree that the "actual malice" standard should be applied to reports on matters of public concern, and that clear and convincing evidence should be required for a defamation recovery on a matter of public concern. I agree that this standard should apply to discourse on matters of public concern irrespective of the characterization of the plaintiff as a public or private figure. In the vast major-

ity of cases involved, it may make little practical difference whether this higher standard is based on the activity rather than the persons because a matter of public concern seems to generate a finding of public or "quasi public" figure. Nevertheless, in considering the extent to which we should tip the scales in favor of free expression, I believe it is helpful to think in terms of the activity rather than the persons involved. Finally, I agree with Justice Sullivan that the fair index test, generously construed, is the proper standard for evaluating a headline.

I reach all of these conclusions purely as a matter of Indiana defamation law. I agree with Justice Sullivan that this case can be resolved under existing federal constitutional precedent and that this analysis produces the same result as I reach under state law and the Court of Appeals reached under *Aafco Heating & Air Conditioning v. Northwest Publications Inc.*, 162 Ind.App. 671, 321 N.E.2d 580 (1974). I do not agree with Justice Dickson that the availability of a federal constitutional resolution renders it inappropriate to express an opinion on these state law issues. To the contrary, I believe this Court should first address the state law issues. In my view their resolution disposes of this case consistent with Justice Sullivan's opinion. However, I disagree with Justice Sullivan's analysis in some respects.

### The "Fair Index" Test

First, I would conclude that the "fair index" test is met on the facts of the case. The fair index test requires a court to determine whether the headline fairly indicates the substance of the matter to which it refers. Maj. op. at 458 (quoting *Burgess v. Reformer Publishing Corp.*, 146 Vt. 612, 508 A.2d 1359 (Vt.1986)). The substance of the article was that the restaurant had been ordered to close because of health concerns including "evidence of insects and rodents." The subheadline read: "Inspectors find rats, roaches [1] at local eatery." In my view, giving reasonable license to editorial choice of words, this subheadline fairly captured the topical sentence of the article and that is the end of the analysis.[2]

---

**1.** Another edition used "bugs" instead of "roaches."

**2.** The conclusion that this headline meets the fair index test is supported by application of the test

### The Meaning of "Actual Malice" and "Reckless Disregard"

Even if the headline were not a fair index of the article, I agree that Bandido's failed to demonstrate that the paper acted with actual malice. I reach that conclusion under state law alone, applying the clear and convincing evidence standard. For the reasons Justice Dickson explains in Part B.5. of his dissent, state law should adhere to the conventional standard of appellate review of jury verdicts. Applying that standard, I nonetheless agree with Justice Sullivan's ultimate resolution of this case. The Journal Gazette may properly adopt an internal rule that headlines should be comprised of terms taken from the story, but failure to observe that guideline is not in itself evidence of malice or reckless disregard for the truth. To the contrary, in my view a headline writer's translation of "rodents" to "rats" does not by itself come close to supporting a finding of actual malice. I base that conclusion not on the testimony of the headline writer but on ordinary usage. As a matter of law some latitude in choice of language is required and substitution of rats for rodents in this context is within that permissible range.

I also write separately to make clear my view that Indiana law need not parallel federal public figure law in all respects. The federal constitution may require a higher degree of malice for claims by a public official or public figure. However *Gertz v. Welch*, 418 U.S. 323, 347, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), explicitly gives the states latitude in formulating their defamation law as to claims by a private individual. As the Court of Appeals held in *Aafco* and this Court holds today, Indiana law requires a showing of actual malice for claims by private individuals based on publication of matters of public concern. In this case, there is no basis to conclude that any reckless disregard or serious doubt existed to support a finding of actual malice. The writer of the article inferred from the public report of rodent droppings that a rodent must be in the area. The headline writer assumed from this, at worst somewhat imprecisely, that the rodent was a rat and not some other rodent. Neither inference in my view approaches recklessness or ill will.

Apart from the specific facts in this case, the "reckless disregard" prong of "actual malice" should be satisfied under Indiana law if one publishes a report with no idea whether it is true or not. Accordingly, although *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and *Aafco*, utilize the term "reckless disregard," I think "reckless indifference" for the truth may be a better term for the activity that is sufficient to impose liability. Thus, in my view, Indiana law should recognize the five scenarios described by Justice White and discussed by Justice Sullivan in footnote 27 as meeting the legal standard of reckless disregard. Justice White identified these as examples of situations where a trier of fact may find assertions of good faith unpersuasive, and described them as:

> Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of the his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they likely prevail when the publisher's allegations are so inherently improbable that only a reckless [person] would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of the [informant's] reports.

*St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). I believe these circumstances, if found by the trier of fact and not offset by other facts supporting veracity, should constitute reckless disregard for purposes of liability for injury to reputation of a private person as a matter of Indiana law, even on topics of public concern.

in other cases. *Compare Hein v. Lacy*, 228 Kan. 249, 616 P.2d 277 (Kan.1980) (headline that Senator Hein voted to "legalize homosexuality" accurately reflected the content of the text where Hein had voted to remove the "legal prohibition of consensual homosexual relationships") *with*

*Burgess*, 508 A.2d at 1359 (headline "Grand Jury Probes Embezzlement: Burgess denies getting funds" failed the fair index test because it conveyed the false impression that Burgess was being investigated by a grand jury when in fact he was only a witness).

*Identifying Matters of Public Concern*

I also wish to emphasize the point in the majority opinion that matters of public concern do not include every activity of a person who for other reasons is in the public eye. I recognize that drawing a line between matters of public and private concern may prove to be problematic. Over time, however, guidelines will emerge and some are already available, assuming Indiana law will track federal constitutional doctrine on this point. *See, e.g., Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 761-62, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). Restricting the actual malice requirement to publications on subjects of public concern will leave the vast majority of the six million Hoosiers for whom Chief Justice Shepard expresses concern subject to a simple negligence standard for defamation. The drawing of these lines illuminated by the experience of concrete cases will afford the opportunity to rein in·abuses that are perceived to flow if the press proves to be insufficiently checked by an actual malice standard. In order to strike this balance properly it is important that Indiana law, like federal constitutional law, treat the determination of public concern as a proposition of law, not a factual determination. Moreover, if the issue is left to the trier of fact, a very substantial risk of chilling speech would likely result from its often inconsistent and unclear resolution. Finally, we have a quarter of a century of experience under *Aafco* and so far the harm to the citizenry is not apparent. In any event, this case presents no significant question on this point. The health status of a restaurant open to the public is plainly a matter of public concern under the precedents and for the reasons cited by Justice Sullivan.

*Indiana Constitutional Provisions*

I agree with Justice Dickson that it is appropriate on occasion to look to constitutional provisions for direction in the development of our common law. *See, e.g., Doe v. Methodist Hosp.,* 690 N.E.2d 681 (Ind.1997). However, here we find somewhat specific provisions pointing in opposite directions. In my view, adopting an actual malice test for defamation actions on matters of public concern gives appropriate recognition to the balance necessary between the conflicting values evidenced in our state constitution: a remedy for injury to reputation and the important interest in the free interchange of thought and opinion. Article I, section 12, of the Indiana Constitution explicitly identifies injury to "reputation" as one proper subject of judicial remedy. Article I, section 9, is even more emphatic than the First Amendment in prohibiting any law "restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever" and it provides for a person to be "responsible" only for "abuse" of those rights. "Abuse" seems to me to fortify the inference that actual malice is an appropriate test for any defamation claim on a matter of public concern. The standard we adopt today gives appropriate recognition to the interest in one's reputation and preserves the notion that one is responsible for abusing the free speech right, but it accomplishes this while still protecting the vital right to comment on, speak about and offer criticism of our government and other matters of public concern. It also leaves to a negligence standard all claims based on allegedly defamatory statements on matters of no public concern.

SHEPARD, Chief Justice, dissenting.

Today's decision makes life more difficult for Indiana's citizens when they have been falsely and publicly maligned in front of their neighbors.

Constructing a regime that affords news organizations a respectable defense for defamation claims might well include some of the walls erected today, but the cumulative effect of this series of barriers is to leave defamed citizens virtually without a remedy. The U.S. Supreme Court and thirty state supreme courts have concluded that a free society can flourish without making it so hard for the average person to defend his or her reputation as it will now be in Indiana. Just one or two state courts have thought otherwise.

**I. Cramped Rights for Private Citizens**

If somebody posts scandalous and defamatory material about a Hoosier on the internet, sending it all over the world, the victim

may gain redress simply by showing that the defamation occurred (and, most likely, by responding effectively to the defense of truth). If a newspaper spreads exactly the same defamatory material, we know from *Gertz v. Welch* that the victim will have to show negligence. Even that, today's opinion finds too favorable to victims. In deploying one of the toughest tests known to the civil law, actual malice, Justice Sullivan lays out various reasons why news organizations need more protection than the public they serve. More or less, he examines all the considerations that led the U.S. Supreme Court to declare that the First Amendment would be secure under a legal regime that makes redressing defamation easier, *Gertz*, 418 U.S. at 344–48, 94 S.Ct. 2997, and finds that Indiana common law must make up for the protection the U.S. Supreme Court found unnecessary.

The greater irony in this choice is that it is justified with a certain flourish to the effect that in Indiana "[t]he reputations of public figures and public officials merit the same quantum of protection as those of private citizens." Slip op. at 452 (quoting *Aafco Heating and Air Conditioning Co. v. Northwest Publications, Inc.,* 162 Ind.App. 671, 321 N.E.2d 580, 587 (Ind.Ct.App.1975)). The opinion accomplishes this "same quantum" by constricting the rights of six million Hoosiers all the way down to the narrow remedy available to Hoosier public figures under *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). I doubt that our fellow citizens, when they have been defamed, will take this restriction as a matter of state pride.

How difficult a task injured parties will confront in persuading appellate judges that they have proven their case is made apparent in the many pages, about sixty percent of the whole opinion, that Justice Sullivan takes to lay out his assessment of the evidence. He weighs the effect of using the word "rat" on the minds of newspaper readers, slip op. at 460–61, draws inferences about the state of mind possessed by the author of the headline, slip op. at 464–65, and about the level of consciousness of others who worked on the Bandido's story, slip op. at 466–67.

As for what evidence appellate judges think would warrant damages, today's decision is bleak news for the injured. Justice Sullivan gives us examples, such as cases in which the news organization actually fabricates a story or a reporter writes defaming material based solely on the reporter's imagination. Slip op. at 465 n. 32.[1] There are known instances in which this sort of thing has occurred, but if these are the models upon which successful cases must depend, the great majority of defamations will be immune.

## II. In Short, Pretty Much Every Citizen Loses

At the end of the day, we have a case before us in which a copy editor wrote a defaming headline that could not be justified on the basis of the reporter's story about reports from the board of health. The copy editor was an employee whose job evaluations reveal that the newspaper knew she produced inaccurate headlines. A local judge had warned the newspaper about the special risks of improper inferences or interpretations of health department inspection reports. Nevertheless, newspaper management had never given the copy editor any directions or cautions about dealing with health department reports on restaurants. Finally, when newspaper management did focus on what its editors had done, it decided not to publish a retraction conforming to Indiana's statute on retractions.[2]

A jury of people in Albion were satisfied that all this showed reckless indifference and that this small business was badly hurt. The

1. Justice Boehm describes the apparent paradigm in an equally narrow way as cases in which one "publishes a report with no idea whether it is true or not." Boehm, concurring, slip op. at 470.

2. The dismissive assessment of this part of the plaintiff's evidence, slip op. at 469–470, reflects on the seriousness of the earlier suggestion that a solid remedy to defamation of citizens would be "passage of state laws creating a limited right to respond to defamatory falsehoods." Slip op. at 453 (quoting *Aafco*, 321 N.E.2d at 587).

appellate judges are not convinced. Judgment for the newspaper.[3]

Most injured plaintiffs will not have the smoking guns that Bandido's brought to this lawsuit. When the Court declares its dissatisfaction with the jury and the evidence in this case, it effectively says to other injured citizens, "You're toast."

DICKSON, J., concurs.

DICKSON, Justice, dissenting.

I respectfully dissent from the majority opinion as to its disapproval of Indiana's traditional common law standard, the failure to use reasonable care (often referred to as "negligence"), in private defamation cases against media defendants. The majority instead chooses the actual malice standard, which federal constitutional jurisprudence mandates only in certain other specified circumstances.

### A. Limitations Imposed by Federal Jurisprudence

Defamation actions, when brought against media defendants, are subject to limitations imposed by the First Amendment[1] to the Constitution of the United States, and thus are analyzed under the United States Supreme Court's freedom of speech and press jurisprudence. Under federal constitutional jurisprudence, the plaintiff's status (whether a public official, a public figure, or a private figure) and the subject matter of the defamatory statement (whether a matter of public or private concern) determine the standard that the plaintiff must prove, the extent to which a state may protect the reputations of its citizens and allow remedy for injury to reputation, the damages available, and the standard of appellate review.

### 1. The Plaintiff's Status as a Factor

The highest standard—the one most protective of media publication—applies when public officials[2] bring defamation actions for statements relating to their official or public conduct. Such public officials may not recover damages for defamatory falsehoods unless they prove both that the statement was false and that the defendant acted with "actual malice." *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The U.S. Supreme Court in *New York Times* announced, "The constitutional guarantees require ... a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80, 84 S.Ct. at 726, 11 L.Ed.2d at 706. The Court concluded that imposing a higher standard on public official plaintiffs would safeguard First Amendment values, would shield media defendants from threats that could cause self-censorship, and would minimize the "chilling effect" that potential liability could have on free speech. *See id.* at 267–83, 84 S.Ct. at 719–27, 11 L.Ed.2d at 698–708.

The same standard that governs public officials also applies to a second category of plaintiffs, public figures. In defamation actions brought by public figure plaintiffs, the *New York Times* standard applies, and the plaintiffs must prove actual malice. *Curtis Publ'g Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). "Public figures" are those who are "intimately involved

---

**3.** This is likely the future result for other injured Hoosiers. A national study suggests that appellate judges (who, as a class, spend more time thinking about how the press will portray their actions than jurors do) tend to rule for the press and that jurors tend to rule for injured parties. Seth Goodchild, Note, *Media Counteractions: Restoring the Balance to Modern Libel Law,* 75 Geo.L.J. 315, 323–24 (1986).

**1.** The First Amendment provides in part: "Congress shall make no law ... abridging the freedom of speech, or of the press...." U.S. Const. amend. I.

**2.** The designation "public official" "applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Rosenblatt v. Baer,* 383 U.S. 75, 85, 86 S.Ct. 669, 676, 15 L.Ed.2d 597, 605 (1966). *See also Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789, 807 (1974) (identifying public officials as "those who hold governmental office").

in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." *Id.* at 164, 87 S.Ct. at 1996, 18 L.Ed.2d at 1116 (Warren, C.J., concurring in the result).

In the category of public figure plaintiffs are three subcategories of public figures. The first subcategory is comprised of involuntary public figures. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789, 808 (1974). Such individuals would become public figures "through no purposeful action of [their] own." *Id.* However, in only the most "exceedingly rare" instances would such truly involuntary public figures be found. *Id.*

The second and third subcategories include "those who ... have assumed roles of especial prominence in the affairs of society." *Id.* at 345, 94 S.Ct. at 3009, 41 L.Ed.2d at 808. In both of these cases, the individuals become public figures because "they invite attention and comment," *id.,* and "assume special prominence in the resolution of public questions," *id.* at 351, 94 S.Ct. at 3013, 41 L.Ed.2d at 812. In the second subcategory are persons who "occupy positions of such persuasive power and influence that they are deemed public figures for all purposes." *Id.* at 345, 94 S.Ct. at 3009, 41 L.Ed.2d at 808. Thus, one becomes a public figure "for all purposes and in all contexts" when that "individual ... achieve[s] ... pervasive fame or notoriety [in the community]." *Id.* at 351, 94 S.Ct. at 3013, 41 L.Ed.2d at 812.

The third subcategory of public figures is most common. These individuals are not public figures for all purposes, but rather only for limited or particular purposes. Limited purpose public figures are those who have "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Id.* at 345, 94 S.Ct. at 3009, 41 L.Ed.2d at 808. These plaintiffs are those who have "voluntarily inject[ed] [them-]sel[ves] or [are] drawn into [ ] particular public contovers[ies] and thereby become[ ] public figure[s] for a limited range of issues." *Id.* at 351, 94 S.Ct. at 3013, 41 L.Ed.2d at 812. In such instances, private individuals

become "public" with respect to particular controversies, and thus may be public figures for certain purposes, but not for others. In order to determine whether a plaintiff is a limited purpose public figure, one considers the plaintiff's specific "participation in the particular controversy giving rise to the defamation." *Id.* at 352, 94 S.Ct. at 3013, 41 L.Ed.2d at 812. *See also id.* at 345, 94 S.Ct. at 3009–10, 41 L.Ed.2d at 808.

In contrast to the standard of proof required for media defamation actions brought by public officials/figures, actions brought by private individuals are not governed by the same federal constitutional constraints. When private individuals, who are neither public officials nor public figures and who have not interjected themselves into particular public controversies, sue for injury caused by libelous statements, the more demanding *New York Times* standard does not apply. *Id.* at 343, 94 S.Ct. at 3008–09, 41 L.Ed.2d at 807 (noting that "the *New York Times* rule states an accommodation between th[e] concern [of providing the press and broadcast media with immunity from liability] and the limited state interest present in the context of libel actions brought by public persons" and concluding that "the state interest in compensating injury to the reputation of private individuals requires that a different rule should obtain with respect to them"). In reaching this holding, the Supreme Court emphasized that the private figure plaintiff

> has relinquished no part of his interest in the protection of his own good name, and consequently he has a more compelling call on the courts for redress of injury inflicted by defamatory falsehood. Thus, private individuals are not only more vulnerable to injury than public officials and public figures; they are also more deserving of recovery.

*Id.* at 345, 94 S.Ct. at 3010, 41 L.Ed.2d at 808.

## 2. Individual Reputation as a Factor

Notwithstanding the important constitutional interests involving the freedom of speech and the press, the U.S. Supreme Court has acknowledged the high value of

the interest that individual citizens have in protecting personal reputation:

> The need to avoid self-censorship by the news media is, however, not the only societal value at issue. If it were, this Court would have embraced long ago the view that publishers and broadcasters enjoy an unconditional and indefeasible immunity from liability for defamation. See *New York Times Co. v. Sullivan, supra,* at 293, 84 S.Ct. 710 (Black, J., concurring); *Garrison v. Louisiana,* 379 U.S., at 80, 85 S.Ct. 209 (Douglas, J., concurring); *Curtis Publishing Co. v. Butts,* 388 U.S., at 170, 87 S.Ct. 1975 (opinion of Black, J.). Such a rule would, indeed, obviate the fear that the prospect of civil liability for injurious falsehood might dissuade a timorous press from the effective exercise of First Amendment freedoms. Yet *absolute protection for the communications media requires a total sacrifice of the competing value served by the law of defamation.*

*Gertz,* 418 U.S. at 341, 94 S.Ct. at 3007–08, 41 L.Ed.2d at 806 (emphasis added).

The Supreme Court has recognized that society also values the reputation of individuals. The *Gertz* Court stated that "[t]he legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood. We would not lightly require the State to abandon this purpose...." *Id.* at 341, 94 S.Ct. at 3008, 41 L.Ed.2d at 806.

> Our accommodation of the competing values at stake in defamation suits by private individuals allows the States to impose liability on the publisher or broadcaster of defamatory falsehood on a less demanding showing than that required by *New York Times.* This conclusion is not based on a belief that the considerations which prompted the adoption of the *New York Times* privilege for defamation of public officials and its extension to public figures are wholly inapplicable to the context of private individuals. Rather, we endorse this approach in recognition of the strong and legitimate state interest in compensating private individuals for injury to reputation.

*Id.* at 348–49, 94 S.Ct. at 3011, 41 L.Ed.2d at 810. The *Gertz* Court then went on to quote approvingly from the following portion of Justice Stewart's concurring opinion in *Rosenblatt v. Baer:*

> The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being— a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the individual States under the Ninth and Tenth Amendments. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system.

> We use misleading euphemisms when we speak of the *New York Times* rule as involving "uninhibited, robust, and wide-open" debate, or "vehement, caustic and sometimes unpleasantly sharp" criticism. What the *New York Times* rule ultimately protects is defamatory falsehood. No matter how gross the untruth, the *New York Times* rule deprives a defamed public official of any hope for legal redress without proof that the lie was a knowing one, or uttered in reckless disregard of the truth.

> That rule should not be applied except where a State's law of defamation has been unconstitutionally converted into a law of seditious libel. The First and Fourteenth Amendments have not stripped private citizens of all means of redress for injuries inflicted upon them by careless liars. The destruction that defamatory falsehood can bring is, to be sure, often beyond the capacity of the law to redeem. Yet, imperfect though it is, an action for damages is the only hope for vindication or redress the law gives to a man whose reputation has been falsely dishonored.

> Moreover, the preventive effect of liability for defamation serves an important public purpose. For the rights and values of private personality far transcend mere personal interests. Surely if the 1950's taught us anything, they taught us that the

poisonous atmosphere of the easy lie can infect and degrade a whole society.

*Rosenblatt v. Baer,* 383 U.S. 75, 92–94, 86 S.Ct. 669, 679–80, 15 L.Ed.2d 597, 609–10 (1966) (Stewart, J., concurring) (footnotes omitted) (quoted in part in *Gertz,* 418 U.S. at 341, 94 S.Ct. at 3008, 41 L.Ed.2d at 806). *See also Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 757–58, 105 S.Ct. 2939, 2944, 86 L.Ed.2d 593, 601–02 (1985) (quoting Justice Stewart).

### 3. Subject Matter as a Factor

Following *New York Times* in 1964, the U.S. Supreme Court initially focused primarily on the plaintiff's status (i.e., whether the plaintiff is a public official, public figure, or private figure). However, in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* the Court shifted its focus to the subject matter of the defamatory statement in reaching its holding. 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). In *Dun & Bradstreet,* a private figure plaintiff sued a non-media defendant, a credit reporting agency, for sending an incorrect credit report to five subscribers.

The *Dun & Bradstreet* plurality opinion, authored by Justice Powell and joined by Chief Justice Rehnquist and Justice O'Connor, characterized its cases after *New York Times* as "all involving public issues." *Id.* at 755, 105 S.Ct. at 2943, 86 L.Ed.2d at 600. *See· also id.* at 756, 105 S.Ct. at 2943, 86 L.Ed.2d at 600 ("Like every other case in which this Court has found constitutional limits to state defamation laws, *Gertz* involved expression on a matter of undoubted public concern."). This *Dun & Bradstreet* opinion suggested that the media protections first recognized in *New York Times* and developed in subsequent cases extend, as the *Rosenbloom* plurality had stated, only to "defamatory statements involv[ing] a 'matter of public or general interest.' " *Id.* at 755, 105 S.Ct. at 2943, 86 L.Ed.2d at 600 (quoting

*Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 44, 91 S.Ct. 1811, 1820, 29 L.Ed.2d 296, 312 (1971) (plurality opinion of Brennan, J.)).[3] In *Dun & Bradstreet,* Justice Powell noted that the Court had "never considered whether the *Gertz* balance obtains when the defamatory statements involve no issue of public concern." 472 U.S. at 757, 105 S.Ct. at 2944, 86 L.Ed.2d at 601. In determining the appropriate standard, the plurality opinion stated that it would "balance the State's interest in compensating private individuals for injury to their reputation against the First Amendment interest in protecting this type of expression." *Id.* at 757, 105 S.Ct. at 2944, 86 L.Ed.2d at 601. The *Dun & Bradstreet* plurality noted that the state interest in allowing compensation for damaged reputations was "identical to the one weighed in *Gertz* [ ] ... [—which was] 'strong and legitimate.' " *Id.* at 757, 105 S.Ct. at 2944, 86 L.Ed.2d at 601 (quoting *Gertz,* 418 U.S. at 348, 94 S.Ct. at 3011, 41 L.Ed.2d at 810). However, the plurality concluded that "[t]he First Amendment interest[—in speech on matters of purely private concern—] ... is less important than the one weighed in *Gertz* [which was a matter of public concern]." *Dun & Bradstreet,* 472 U.S. at 758, 105 S.Ct. at 2944, 86 L.Ed.2d at 602. *See also id.* at 759, 105 S.Ct. at 2945, 86 L.Ed.2d at 603.

The Court continued, "In light of the reduced constitutional value of speech involving no matters of public concern, we hold that the state interest adequately supports awards of presumed and punitive damages— even absent a showing of 'actual malice.' " *Id.* at 761, 105 S.Ct. at 2946, 86 L.Ed.2d at 603–04 (footnote omitted). The plurality then asserted that the speech at issue, an incorrect credit report, was not a matter of public concern and, like advertising, was "hardy and unlikely to be deterred by incidental state regulation." *Id.* at 762, 105 S.Ct. at 2947, 86 L.Ed.2d at 605. The plural-

---

**3.** The *Gertz* Court emphatically rejected the *Rosenbloom* plurality opinion. *Gertz,* 418 U.S. at 346, 94 S.Ct. at 3010, 41 L.Ed.2d at 809. However, the *Dun & Bradstreet* plurality seemed to breathe new life into some aspects of the *Rosenbloom* plurality when it quoted the *Rosenbloom* plurality opinion and embraced that plurality's ruling on the subject matter of the speech. *Dun*

*& Bradstreet,* 472 U.S. at 755–63, 105 S.Ct. at 2943–47, 86 L.Ed.2d at 600–05. *See also id.* at 785 n. 11, 105 S.Ct. at 2959 n. 11, 86 L.Ed.2d at 620 n. 11 (Brennan, J., dissenting) ("Distrust of placing in the courts the power to decide what speech was of public concern was precisely the rationale *Gertz* offered for rejecting the *Rosenbloom* plurality approach.").

ity concluded that "permitting recovery of presumed and punitive damages in defamation cases absent a showing of 'actual malice' does not violate the First Amendment when the defamatory statements do not involve matters of public concern." *Id.* at 763, 105 S.Ct. at 2947, 86 L.Ed.2d at 605.

To date, U.S. Supreme Court opinions have not directly confronted the First Amendment's requirements when the plaintiffs are public officials or all purpose public figures and the subject matter is merely of private concern.[4] In *New York Times,* when the Court first articulated its new standard, it stated that "[t]he constitutional guarantees require ... a federal rule that prohibits a public official from recovering damages for a defamatory falsehood *relating to his official conduct* unless he proves that the statement was made with 'actual malice'.…." *New York Times,* 376 U.S. at 279–80, 84 S.Ct. at 726, 11 L.Ed.2d at 706 (emphasis added). The *Rosenbloom* plurality noted that defamatory speech may enter into "aspects of the lives of 'public figures' that are not in the area of public or general concern." *Rosenbloom,* 403 U.S. at 48, 91 S.Ct. at 1822, 29 L.Ed.2d at 314, *quoted in Gertz,* 418 U.S. at 364, 94 S.Ct. at 3019, 41 L.Ed.2d at 819 (Brennan, J., dissenting).[5]

Regarding the implications of *Dun & Bradstreet* for this issue, Professors Nowak and Rotunda have explained:

4. This issue would only arise in a small number of cases involving public officials and all purpose public figures. The involuntary public figures class is small and rare, and such individuals become public figures through no purposeful action of their own. *Gertz,* 418 U.S. at 345, 94 S.Ct. at 3009, 41 L.Ed.2d at 808. Limited purpose public figures only become public figures because they are linked to particular public controversies, and thus they are public figures only for a limited range of issues. *Id.* at 352, 94 S.Ct. at 3013, 41 L.Ed.2d at 812. When they do not qualify as public figures, these individuals retain their status as private figure plaintiffs.

5. However, the *Gertz* Court indicated that the public's interest in speech about public officials might extend to " 'anything which might touch on an official's fitness for office.' " *Gertz,* 418 U.S. at 344–45, 94 S.Ct. at 3009, 41 L.Ed.2d at 808 (quoting *Garrison,* 379 U.S. 64, 77, 85 S.Ct. 209, 217, 13 L.Ed.2d 125, 134 (1964)). The *Gertz* Court also described all purpose public figures as those who "invite attention and comment," *id.* at 345, 94 S.Ct. at 3009, 41 L.Ed.2d at

There is nothing in the Powell plurality [in *Dun & Bradstreet* ] that would limit its application to cases where the plaintiff is a private person. That is, for the three Justices who make up the Powell plurality, it may well be the case that a public official or public figure could also collect presumed or punitive damages without even showing any negligence on the part of the defendant if the alleged defamation does not involve a matter of "public concern."

JOHN E. NOWAK & RONALD D. ROTUNDA, CONSTITUTIONAL LAW § 16.35, at 1102 (5th ed.1995). Professor Tribe has also noted:

In *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* the Court took the bifurcated analysis of public figure-private figure and bifurcated it once more, stating that the first amendment would protect only "speech on matters of public concern." Accordingly, when the plaintiff is not a public figure and the contested statement is not about a matter of public concern, the "actual malice" standard does not apply.

LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 12–13, at 873 (2d ed.1988). Professor Tribe further explained that, "as *Dun & Bradstreet* made clear, the Court is especially reluctant to limit the common law of defamation when the subject matter of the speech is 'purely private.' " *Id.* § 12–13, at 878.[6]

808, and who "assume special prominence in the resolution of public questions," *id.* at 351, 94 S.Ct. at 3013, 41 L.Ed.2d at 812, and as public figures "for all purposes and in all contexts" because those "individual[s] ... achieve ... pervasive fame or notoriety [in the community]," *id.*

6. Similarly, Professor Smolla has also provided the following commentary regarding the implications of *Dun & Bradstreet* when the plaintiffs are public officials/figures and the subject matter is purely private: "Because the speech is outside of the scope of comment on public officials or public figures to whom the actual malice test applies, those persons may essentially 'revert' to private figure status, and since the speech is not about a matter of public concern, strict liability may apply." RODNEY A. SMOLLA, LAW OF DEFAMATION § 3.04 (1989 ed. & Supp.1998). Professor Smolla continued: "Nevertheless, the implications of *Dun & Bradstreet* are yet to be worked out, and it seems at least possible that for certain purely private matters, defamatory speech involving public officials and all purpose public figures could revert

#### 4. State Authority in Private Defamation Actions

As discussed in the preceding sections, the U.S. Supreme Court recognizes that individual states have the option to select the standard of proof applicable when private individual plaintiffs assert defamation actions against media defendants regarding matters of public concern. While the states may choose the *New York Times* actual malice standard, which the Supreme Court applies to require public official/figure plaintiffs to prove actual malice when their public conduct is at issue, this standard is not obligatory upon the states in private defamation cases. The U.S. Supreme Court has expressly recognized that the states have the authority to define the appropriate standard of liability in cases in which media defendants are alleged to have defamed private figure plaintiffs. *Gertz*, 418 U.S. at 345–46, 94 S.Ct. at 3010, 41 L.Ed.2d at 809 (stating that "the States should retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual"). The *Gertz* Court explained that, under its accommodation of the competing values, the Constitution "allows the States to impose liability on the publisher or broadcaster of defamatory falsehood on a less demanding showing than that required by *New York Times*." *Id.* at 348, 94 S.Ct. at 3011, 41 L.Ed.2d at 810. The *Gertz* Court also stated, "[S]o long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id.* at 347, 94 S.Ct. at 3010, 41 L.Ed.2d at 809. *See also Rosenbloom*, 403 U.S. at 68–72, 91 S.Ct. at 1832–34, 29 L.Ed.2d at 326–28 (Harlan, J., dissenting) (arguing that the states could constitutionally allow private individuals to recover damages for defamation on the basis of a reasonable care standard); *id.* at 86–87, 91 S.Ct. at 1841, 29 L.Ed.2d at 336 (Marshall, J., dissenting) (arguing that the states should be "essentially free to continue the evolution of the common law of defamation and to articulate whatever fault standard best suits below the *Gertz* negligence standard all the way

the State's need," as long as liability is not imposed without fault).

The *Gertz* Court refused to follow the *Rosenbloom* plurality opinion which would have extended the *New York Times* test to those defamation cases brought by private figure plaintiffs and involving issues of public concern. *Gertz*, 418 U.S. at 346, 94 S.Ct. at 3010, 41 L.Ed.2d at 809. The Court disapproved of such an extension on two grounds: (1) "[t]he extension of the *New York Times* test proposed by the *Rosenbloom* plurality would abridge this legitimate state interest to a degree that we find unacceptable," and (2) "it would occasion the additional difficulty of forcing state and federal judges to decide on an *ad hoc* basis which publications address issues of 'general or public interest' and which do not—to determine, in the words of Mr. Justice Marshall, 'what information is relevant to self-government.'" *Id.* at 346, 94 S.Ct. at 3010, 41 L.Ed.2d at 809 (quoting *Rosenbloom*, 403 U.S. at 79, 91 S.Ct. at 1837, 29 L.Ed.2d at 332). The Court concluded that the "general or public interest" test was entirely unsuitable in private defamation actions:

> The "public or general interest" test for determining the applicability of the *New York Times* standard to private defamation actions inadequately serves both of the competing values at stake. On the one hand, a private individual whose reputation is injured by defamatory falsehood that does concern an issue of public or general interest has no recourse unless he can meet the rigorous requirements of *New York Times*. This is true despite the factors that distinguish the state interest in compensating private individuals from the analogous interest involved in the context of public persons. On the other hand, a publisher or broadcaster of a defamatory error which a court deems unrelated to an issue of public or general interest may be held liable in damages even if it took every reasonable precaution to ensure the accuracy of its assertions. . . .

*Gertz*, 418 U.S. at 346, 94 S.Ct. at 3010, 41 L.Ed.2d at 809. *See also Rosenbloom*, 403 U.S. at 62–72, 91 S.Ct. at 1829–34, 29 to strict liability." *Id.*

L.Ed.2d at 322–28 (Harlan, J., dissenting) (urging that a "reasonable man" or simple negligence standard should apply to media defendants in defamation actions brought by private individuals); *id.* at 79, 91 S.Ct. at 1837, 29 L.Ed.2d at 332 (Marshall, J., dissenting) (arguing that the approach taken by Justice Brennan in the plurality opinion would inadequately serve and, in fact, "threatens society's interest in protecting private individuals from being thrust into the public eye by the distorting light of defamation").

The *Gertz* Court provided two rationales for its creation of two different standards for defamation plaintiffs: (1) private figures are more vulnerable to injury because they typically have less media access than public officials/figures to counteract defamatory speech, and (2) private figures are more deserving of recovery because they have not voluntarily become involved in public controversies in order to influence their outcome. *Gertz,* 418 U.S. at 344–45, 94 S.Ct. at 3009–10, 41 L.Ed.2d at 807–08. The Court noted that its approach served two important purposes: (1) it "provides a more equitable boundary between the competing concerns involved," and (2) it "recognizes the strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation, yet shields the press and broadcast media from the rigors of strict liability for defamation." *Id.* at 347–48, 94 S.Ct at 3010–11, 41 L.Ed.2d at 809–10.

Therefore, private figure plaintiffs must at least prove negligence to recover in defamation actions against media defendants for injury to their reputations. *See Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 768, 106 S.Ct. 1558, 1559, 89 L.Ed.2d 783, 787 (1986) ("In *Gertz,* the Court held that a private figure who brings a suit for defamation cannot recover without some showing that the media defendant was at fault in publishing the statements at issue.") (citing *Gertz,* 418 U.S. at 347, 94 S.Ct. at 3010, 41 L.Ed.2d at 809); *Dun & Bradstreet,* 472 U.S. at 763, 105 S.Ct. at 2947, 86 L.Ed.2d at 605 (Burger, C.J., concurring in the judgment) ("In *Gertz* ..., contrary to well-established common law prevailing in the states, a divided Court held that a private plaintiff in a defamation action

cannot recover for a published falsehood unless he proves that the defendant was at least negligent in publishing the falsehood."); *id.* at 766, 105 S.Ct. at 2949, 86 L.Ed.2d at 607 (White, J., concurring in the judgment) ("[I]n *Gertz* ..., the court again dealt with defamation actions by private individuals, for the first time holding that such plaintiffs could no longer recover by proving a false statement, no matter how damaging it might be to reputation. They must, in addition, prove some 'fault,' at least negligence.") (citing *Gertz,* 418 U.S. at 347, 350, 94 S.Ct. at 3012, 41 L.Ed.2d at 811). In 1986, with *Philadelphia Newspapers,* the Court provided the following summary of its case law:

> One can discern in these decisions two forces that may reshape the common-law landscape to conform to the First Amendment. The first is whether the plaintiff is a public official or figure, or is instead a private figure. The second is whether the speech at issue is of public concern. When the speech is of public concern and the plaintiff is a public official or public figure, the Constitution clearly requires the plaintiff to surmount a much higher barrier before recovering damages from a media defendant than is raised by the common law. When the speech is of public concern but the plaintiff is a private figure, as in *Gertz,* the Constitution still supplants the standards of the common law, but the constitutional requirements are, in at least some of their range, less forbidding than when the plaintiff is a public figure and the speech is of public concern. When the speech is of exclusively private concern and the plaintiff is a private figure, as in *Dun & Bradstreet,* the constitutional requirements do not necessarily force any change in at least some of the features of the common-law landscape.

*Philadelphia Newspapers,* 475 U.S. at 775, 106 S.Ct. at 1563, 89 L.Ed.2d at 791–92.

Thus, in defamation actions brought by private figure plaintiffs against media defendants, and presumably in those by public officials/figures involving private matters, states may apply their own common law or statutory standards. The *Gertz* Court seemed to contemplate at least two alterna-

tive standards of liability that the states could adopt: (1) the actual malice standard suggested by the *Rosenbloom* plurality when defamatory statements involve issues of "general or public interest," or (2) some negligence standard short of strict liability as suggested by the *Gertz* majority.

### 5. Standard of Appellate Review

The U.S. Supreme Court has imposed a special standard of appellate review when federal First Amendment implications require application of the *New York Times* actual malice standard. In such cases, appellate courts must independently review trial court determinations of actual malice to ensure that the correct standard was applied— that plaintiffs proved by clear and convincing evidence that the defendants acted with actual malice in publishing falsehood with knowledge of the falsity or reckless disregard for whether it was false. *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 514, 104 S.Ct. 1949, 1967, 80 L.Ed.2d 502, 526 (1984) ("Appellate judges in such a case must exercise independent judgment and determine whether the record establishes actual malice with convincing clarity."). That Court also stated, "Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'" *Id.*, 466 U.S. at 511, 104 S.Ct. at 1965, 80 L.Ed.2d at 523.

However, the U.S. Supreme Court has not imposed this special standard of independent appellate scrutiny upon the states when reviewing verdicts in defamation cases involving private figure plaintiffs, even in matters of public concern, or in those involving public officials/figures and private concerns. The states remain free to determine the applicable standard of appellate review in such cases.

### B. Determining the Rules for Indiana Defamation Law

As noted above, the decisions of the U.S. Supreme Court have recognized the substantial authority of the states to determine state law regarding private figure defamation cases against media defendants in matters of public and private concern. In the absence of statute, the Indiana Supreme Court must select the appropriate common law standards of proof for our state, considering both freedom of the press and media accountability for defamatory falsehoods about private individuals.

Neither this challenge nor its resolution is of recent vintage. Two hundred and one years ago, three years before he became Chief Justice of the United States, John Marshall wrote:

> Among those principles deemed sacred in America, among those precious rights considered as forming the bulwark of their liberties, which the Government contemplates with awful reverence; ... there is no one ... more deeply impressed on the public mind, than the liberty of the press. That this liberty is often carried to excess, that it has sometimes degenerated into licentiousness, is seen and lamented; but the remedy has not yet been discovered. Perhaps it is an evil inseparable from the good to which it is allied, perhaps it is a shoot which cannot be stripped from the stalk, without wounding vitally the plant from which it is torn. However desirable those measures may be, which might correct without enslaving the press, they have never yet been devised in America. No regulations exist which enable the government to suppress whatever calumnies or invectives any individual may ch[oo]se to offer to the public eye, or to punish such calumnies and invectives otherwise, *than by a legal prosecution in courts, which are alike open to all who consider themselves as injured.*

Letter from John Marshall to Talleyrand (Apr. 3, 1798), *in* 3 THE PAPERS OF JOHN MARSHALL 447 (1984) (emphasis added). Later, as Chief Justice, Marshall declared for the unanimous Court: "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60, 69 (1803).

### 1. Viewing *Aafco* in Perspective

Shortly after the U.S. Supreme Court in *Gertz* expressly permitted individual states to determine the applicable standard of proof in private figure defamation cases, a divided panel of the Indiana Court of Appeals issued its opinion in *Aafco Heating & Air Conditioning Co. v. Northwest Publications, Inc.*, 162 Ind.App. 671, 321 N.E.2d 580 (1974), preferring to displace the negligence standard with the actual malice test. The Indiana Supreme Court did not grant transfer,[7] nor have we until now ever addressed the *Gertz* option issue. Transfer was sought in *Aafco* during an era prior to this Court's recognition of the renewed vitality of Indiana's own constitution. Reflecting on this era, Professor Baude observed twelve years later: "Nobody expects, therefore, the Indiana Supreme Court to find [state] constitutional rights the federal courts do not force upon it." Patrick Baude, *Is There Indepen-*

*dent Life in the Indiana Constitution?*, 62 IND. L.J. 263, 268 (1987). Fifteen years would elapse between *Aafco* and the publication of Chief Justice Shepard's seminal article, *Second Wind for the Indiana Bill of Rights*, 22 IND. L.REV. 575 (1989), which triggered a refocusing of judicial and legal attention on the provisions of the Indiana Constitution.

The precedential value of *Aafco* is dubious for several other reasons. *Aafco* was handed-down just six months after the U.S. Supreme Court decided *Gertz*,[8] but over ten years before *Dun & Bradstreet*.[9] Thus, the *Aafco* court was unable to benefit from extensive federal and state case law and scholarly discussion that have appeared in the ensuing twenty-five years. During this time, some Indiana judges have questioned the wisdom of the *Aafco* standard,[10] and federal judges have hesitantly applied it as Indiana law.[11] Furthermore, it places Indiana among

7. Because of various factors including the burden of other pending cases, particularly criminal cases for which this Court has exclusive constitutional responsibility, the denial of transfer does not necessarily reflect Supreme Court approval of decisions of the Court of Appeals in which transfer is sought. "The denial of a petition to transfer shall have no legal effect other than to terminate the litigation between the parties in the Supreme Court." Ind. Appellate Rule 11(B)(4).

8. The *Aafco* decision was handed down on December 30, 1974, and the *Gertz* decision was handed down on June 25, 1974. In his dissent in *Aafco*, Judge Garrard noted that "at the time the trial court rendered its decision, it was guided only by the plurality opinion of *Rosenbloom v. Metromedia, Inc.* (1971), 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296, which indicated that application of the *New York Times* standard would be proper." *Aafco*, 162 Ind.App. at 689, 321 N.E.2d at 591–92. Judge Garrard continued: "However, on June 25, 1974, the Supreme Court issued its decision in *Gertz v. Welch* (1974), 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789, and by a majority of the Court redefined the applicability of First Amendment privilege as a defense in certain libel actions. It therefore becomes necessary to determine whether Aafco has presented a viable claim on the facts presented under the modification announced in *Gertz*." *Id.* at 689, 321 N.E.2d at 592.

9. The *Dun & Bradstreet* decision was handed down on June 26, 1985.

10. Indiana Court of Appeals Judge Garrard has consistently stated his disagreement with the majority opinion in *Aafco*, and he was joined by

Judge Hoffman. *See Journal–Gazette Co. v. Bandido's, Inc.*, 672 N.E.2d 969, 973 n. 3 (Ind.Ct. App.1996) (expressing disagreement with the *Aafco* standard); *Patten v. Smith*, 172 Ind.App. 300, 307, 360 N.E.2d 233, 238 (1977) (Garrard, J., concurring in result with opinion in which Hoffman, J., concurred) ("I adhere to my dissent in *Aafco* . . . and reiterate that actual damages should be allowed for the *negligent* publication of a defamatory falsehood involving a private individual who is neither a public official nor a public figure."); *Aafco*, 321 N.E.2d at 591, 593–94 (Garrard, J., dissenting) (disagreeing with the *Aafco* majority's interpretation of *Gertz* and Article 1, Section 9 of the Indiana Constitution and objecting to the court's new standard).

11. *See Jean v. Dugan*, 20 F.3d 255, 262 (7th Cir.1994); *Chang v. Michiana Telecasting Corp.*, 900 F.2d 1085, 1087 (7th Cir.1990); *Schaefer v. Newton*, 868 F.Supp. 246, 252 (S.D.Ind.1994). In a Seventh Circuit opinion, Judge Easterbrook spoke critically of the *Aafco* standard:

In *Aafco* . . ., a panel of the state's court of appeals held that in Indiana even private figures must establish actual malice, if the statements relate to an issue of public concern.
*Aafco* puts Indiana among a small minority of states. According to Rodney Smolla, *The Law of Defamation* § 3.11 (1989 ed.), only four (Alaska, Colorado, Indiana, and New Jersey) require a private-figure plaintiff to prove actual malice. Michigan recently switched to a negligence standard, *Rouch v. Enquirer & News*, 427 Mich. 157, 398 N.W.2d 245 (1986), and a federal court has predicted that Alaska will follow suit when it has the chance, *Sisemore v.*

a very small minority of jurisdictions that extend to the media considerably more protection than the U.S. Supreme Court requires. *See Chang v. Michiana Telecasting Corp.*, 900 F.2d 1085, 1087 (7th Cir.1990) (citing RODNEY A. SMOLLA, LAW OF DEFAMA-

TION § 3.11 (1989)).[12] The vast majority of the states, either through their courts or legislatures, have chosen some form of negligence standard in defamation actions brought by private figure plaintiffs.[13] *See* SMOLLA, *supra*, § 3.10.

*U.S. News & World Report, Inc.*, 662 F.Supp. 1529 (D.Alaska 1987). *Moffatt v. Brown*, 751 P.2d 939 (Alaska 1988), which rejects the "clear and convincing proof" requirement in private figure cases, suggests that *Sisemore* may be prescient. *Aafco* itself was the product of a divided panel, and in a later case, *Patten v. Smith*, 172 Ind.App. 300, 360 N.E.2d 233 (3d Dist.1977), Judge Garrard, the author of the dissent in *Aafco*, picked up the support of a newly appointed colleague, Judge Hoffman. *Patten* did not overrule *Aafco* . . . .

. . . If we had nothing but *Aafco* and *Patten* to go on, we would think the law of Indiana muddy. Two subsequent cases have followed *Aafco*, deeming it authoritative. *Cochran v. Indianapolis Newspapers, Inc.*, 175 Ind.App. 548, 372 N.E.2d 1211, 1218 & n. 3 (2d Dist. 1978); *Elliott v. Roach*, 409 N.E.2d 661, 685–86 (Ind.App. 4th Dist.1980). No Indiana court has disagreed with *Aafco*, and four years ago we took *Aafco* to be the established law of Indiana. *Woods v. Evansville Press Co.*, 791 F.2d 480, 483 (7th Cir.1986). See also *Gintert v. Howard Publications, Inc.*, 565 F.Supp. 829, 838–39 (N.D.Ind.1983). . . .

*Aafco* has drawn adverse comment from several judges of Indiana—not only Judges Garrard and Hoffman but also the panel in *Cochran*, which expressed doubts but followed *Aafco* to maintain uniformity. Yet it does not stand alone, and although the trend in other states is against it, New Jersey adopted the actual malice standard even as Michigan abandoned it. *Sisler v. Gannett Co.*, 104 N.J. 256, 516 A.2d 1083 (1986). New York uses an intermediate approach, *Chapadeau v. Utica Observer–Dispatch, Inc.*, 38 N.Y.2d 196, 379 N.Y.S.2d 61, 341 N.E.2d 569 (1975), and decisions of appellate courts in California go both ways, see Smolla (collecting cases). Skepticism among Indiana's judges is not the same as conflict in decision. *Aafco* is straightforward and, for the moment, the reigning expression of state law. The Supreme Court of Indiana has had ample opportunity to express a different view and has so far elected not to do so. . . .

*Chang*, 900 F.2d at 1087.

**12.** Professor Smolla listed Indiana with Alaska (*Gay v. Williams*, 486 F.Supp. 12, 14–16 (D.Alaska 1979) (applying Alaska law)), Colorado (*Diversified Management, Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1106, 1109–10 (Colo.1982); *Walker v. Colorado Springs Sun, Inc.*, 188 Colo. 86, 538 P.2d 450, 457–59 (Colo.1975); *Haan v. Board of Publications of the Christian Reformed Church, Inc.*, 10 Med.L.Rep. (BNA) 1671, 1672 (Colo.

Dist.Ct.1984)), and New Jersey (*Sisler v. Gannett Co.*, 104 N.J.256, 516 A.2d 1083, 1095 (N.J. 1986)), as the only four states requiring private figures to prove actual malice when the subject matter of the speech is an issue of public concern. SMOLLA, THE LAW OF DEFAMATION § 3.11.

**13.** Professor Smolla identified the following jurisdictions as having adopted some form of negligence standard in private defamation actions against media defendants: Alabama (*Mead Corp. v. Hicks*, 448 So.2d 308, 313 (Ala.1983); *Browning v. Birmingham News*, 348 So.2d 455 (Ala. 1977)); Arizona (*Peagler v. Phoenix Newspapers, Inc.*, 114 Ariz. 309, 560 P.2d 1216, 1222 (Ariz. 1977)); Arkansas (*Little Rock Newspapers, Inc. v. Dodrill*, 281 Ark. 25, 660 S.W.2d 933, 937–38 (Ark.1983); *KARK–TV v. Simon*, 280 Ark. 228, 656 S.W.2d 702, 704 (Ark.1983); *Dodrill v. Arkansas Democrat Co.*, 265 Ark. 628, 590 S.W.2d 840, 844 (Ark.1979)); California (*Widener v. Pacific Gas & Elec. Co.*, 75 Cal.App.3d 415, 433, 142 Cal.Rptr. 304, 313 (1977)); Connecticut (*Corbett v. Register Publ'g Co.*, 33 Conn.Supp. 4, 356 A.2d 472, 476–77 (Conn.Super.Ct.1975)); Delaware (*Re v. Gannett Co.*, 480 A.2d 662, 666 (Del.Super.Ct.1984), *aff'd*, 496 A.2d 553, 557 (Del.1985)); District of Columbia (*Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 90 (D.C. 1980)); Florida (*Miami Herald Publ'g Co. v. Ane*, 458 So.2d 239, 241–42 (Fla.1984); *Tribune Co. v. Levin*, 458 So.2d 243, 244 (Fla.1984)); Georgia (*Triangle Publications, Inc. v. Chumley*, 253 Ga. 179, 317 S.E.2d 534, 536–37 (Ga.1984); *Savannah News–Press, Div. Southeastern Newspapers Corp. v. Whetsell*, 149 Ga.App. 233, 254 S.E.2d 151, 152 (Ga.Ct.App.1979); *Williams v. Trust Co. of Ga.*, 140 Ga.App. 49, 230 S.E.2d 45, 47–51 (Ga.Ct.App.1976)); Hawaii (*Cahill v. Hawaiian Paradise Park Corp.*, 56 Haw. 522, 543 P.2d 1356, 1362–67 (Haw.1975)); Idaho (IDAHO CODE § 6– 708); Illinois (*Troman v. Wood*, 62 Ill.2d 184, 340 N.E.2d 292, 299 (Ill.1975)); Kansas (*Gobin v. Globe Publ'g Co.*, 216 Kan. 223, 531 P.2d 76, 84 (Kan.1975); *Sellars v. Stauffer Communications, Inc.*, 9 Kan.App.2d 573, 684 P.2d 450, 453– 56 (Kan.Ct.App.1984)); Kentucky (*McCall v. Courier–Journal & Louisville Times Co.*, 623 S.W.2d 882, 886 (Ky.1981)); Louisiana (*Wilson v. Capital City Press*, 315 So.2d 393, 397–98 (La.Ct.App.1975), *cert. denied specifically approving decision*, 320 So.2d 203 (La.1975); *Melon v. Capital City Press*, 407 So.2d 85, 86 (La.Ct.App. 1981); *LeBoeuf v. Times Picayune Publ'g Corp.*, 327 So.2d 430, 431 (La.Ct.App.1976)); Maryland (*General Motors Corp. v. Piskor*, 277 Md. 165, 352 A.2d 810, 814–15 (Md.1976); *Jacron Sales Co. v. Sindorf*, 276 Md. 580, 350 A.2d 688, 698–700

## 2. The Right to Remedy for Reputation Injury

Article I, Section 12 of the Indiana Constitution provides: "All courts shall be open; and every person, for *injury done to him in his* person, property, or *reputation, shall have remedy* by due course of law. Justice shall be administered freely, and without purchase, completely, and without denial; speedily, and without delay." IND. CONST. art. I, § 12 (emphasis added). When confronted with a choice between alternative common law policies, this Court will find guidance in the values embodied in our state constitution, particularly this provision assuring remedy for injury to reputation. *Bals v. Verduzco*, 600 N.E.2d 1353, 1355 (Ind.1992).[14] Neither the Court of Appeals in *Aafco* nor the majority in the present case considers or discusses the import of Indiana's express constitutional protection for the right to remedy for harm to reputation. However, the majority does acknowledge that the law of defamation was created because of society's strong interest in protecting against attacks upon individual reputation.[15]

(Md.1976)); Massachusetts (*Stone v. Essex County Newspapers, Inc.*, 367 Mass. 849, 330 N.E.2d 161, 168 (Mass.1975)); Michigan (*Rouch v. Enquirer & News of Battle Creek*, 427 Mich. 157, 398 N.W.2d 245, 263–65 (Mich.1986); *Deitz v. Wometco West Michigan TV*, 160 Mich.App. 367, 407 N.W.2d 649, 653 (Mich.Ct.App.1987)); Minnesota (*Jadwin v. Minneapolis Star & Tribune Co.*, 367 N.W.2d 476, 491–92 (Minn.1985)); Mississippi (*Brewer v. Memphis Publ'g Co.*, 626 F.2d 1238, 1246–47 (5th Cir.1980) (applying Mississippi law)); New Hampshire (*McCusker v. Valley News*, 121 N.H. 258, 428 A.2d 493, 494–95 (N.H. 1981)); New Mexico (*Marchiondo v. Brown*, 98 N.M. 394, 649 P.2d 462, 470 (N.M.1982)); North Carolina (*Walters v. Sanford Herald, Inc.*, 31 N.C.App. 233, 228 S.E.2d 766, 767 (N.C.Ct.App. 1976)); Ohio (*Lansdowne v. Beacon Journal Publ'g Co.*, 32 Ohio St.3d 176, 512 N.E.2d 979, 983–84 (Ohio 1987); *Embers Supper Club, Inc. v. Scripps–Howard Broad. Co.*, 9 Ohio St.3d 22, 457 N.E.2d 1164, 1167 (Ohio 1984); *Thomas H. Maloney & Sons, Inc. v. E.W. Scripps Co.*, 43 Ohio App.2d 105, 334 N.E.2d 494, 498 (Ohio Ct.App. 1974)); Oklahoma (*Martin v. Griffin Television, Inc.*, 549 P.2d 85, 92 (Okla.1976)); Oregon (*Bank of Oregon v. Independent News, Inc.*, 65 Or.App. 29, 670 P.2d 616, 623–29 (Or.Ct.App.1983), *aff'd*, 298 Or. 434, 693 P.2d 35, 43–44 (Or.1985); *Wheeler v. Green*, 286 Or. 99, 593 P.2d 777, 788–89 (Or.1979)); Pennsylvania (*Marcone v. Penthouse Int'l, Ltd.*, 533 F.Supp. 353, 360–61 (E.D.Pa.1982), *rev'd on other grounds*, 754 F.2d 1072 (3d Cir.1985) (applying Pennsylvania law); *Medico v. Time, Inc.*, 509 F.Supp. 268, 277 n. 7 (E.D.Pa.1980), *aff'd on other grounds*, 643 F.2d 134 (3d Cir.1981) (applying Pennsylvania law); *Mathis v. Philadelphia Newspapers, Inc.*, 455 F.Supp. 406, 410–12 (E.D.Pa.1978) (applying Pennsylvania law)); Puerto Rico (*Torres–Silva v. El Mundo*, 106 P.R.Dec. 15, 3 Med.L.Rep. (BNA) 1508, 1977 WL 50834 (P.R.1977)); Rhode Island (*DeCarvalho v. daSilva*, 414 A.2d 806, 812–13 (R.I.1980)); South Carolina (*Jones v. Sun Publ'g Co.*, 278 S.C. 12, 292 S.E.2d 23, 24–25 (S.C. 1982)); Tennessee (*Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 417–18 (Tenn.1978)); Texas (*Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809, 819 (Tex.1976)); Utah (*Seegmiller v. KSL, Inc.*, 626 P.2d 968, 972–76 (Utah 1981)); Vermont (*Colombo v. Times–Argus Ass'n, Inc.*, 135 Vt. 454, 380 A.2d 80, 82–83 (Vt.1977)); Virginia (*Gazette v. Harris*, 229 Va. 1, 325 S.E.2d 713, 724–26 (Va.1985)); Washington (*Caruso v. Local Union No. 690*, 100 Wash.2d 343, 670 P.2d 240, 244–45 (Wash.1983); *Bender v. Seattle*, 99 Wash.2d 582, 664 P.2d 492, 503–05 (Wash. 1983); *Taskett v. KING Broad. Co.*, 86 Wash.2d 439, 546 P.2d 81, 84–86 (Wash.1976)); West Virginia (*Crump v. Beckley Newspapers, Inc.*, 173 W.Va. 699, 320 S.E.2d 70, 77 (W.Va.1984)); Wisconsin (*Denny v. Mertz*, 106 Wis.2d 636, 318 N.W.2d 141, 150–52 (Wis.1982)); and Wyoming (*Adams v. Frontier Broad. Co.*, 555 P.2d 556, 560–62 (Wyo.1976)). SMOLLA, *supra*, § 3.10. New York Court of Appeals in *Chapadeau v. Utica Observer–Dispatch, Inc.*, 38 N.Y.2d 196, 379 N.Y.S.2d 61, 341 N.E.2d 569, 570–71 (N.Y.1975), adopted an intermediate standard of "gross irresponsibility." SMOLLA, *supra*, § 3.12.

14. *See also Doe v. Methodist Hosp.*, 690 N.E.2d 681, 695 (Ind.1997) (Dickson, J., concurring in result with separate opinion, in which Sullivan, J., concurred) ("The Indiana Constitution provides express recognition of an individual's interest in reputation and accords it specific protection.").

15. This statement is well-supported in Anglo-American and Indiana law. The plurality opinion in *Doe v. Methodist Hosp.* recognized that "[d]efamation law has traditionally addressed similar injuries to reputation." 690 N.E.2d 681, 686 (Ind.1997). The plurality continued, "This Court recognized 150 years ago that libelous defamation injured a person's reputation and thereby exposed him 'to public hatred, contempt,' or ridicule.'" *Id.* (quoting *Armentrout v. Moranda*, 8 Blackf. 426, 427 (Ind.1847)). *See also* 50 AM.JUR.2D *Libel and Slander* § 2 (1995) ("The gravamen or gist of an action for defamation is damage to the plaintiff's reputation. It is reputation which is defamed, reputation which is injured, and reputation which is protected by the law of defamation. Defamation is an impairment of a relational interest; it denigrates the opinion which others in the community have of

The reputation remedy provision of our present state constitution, adopted in 1851, parallels its 1816 predecessor, which stated, "That all Courts shall be open, and every person, *for injury done him, in his* lands, goods, person, or *reputation, shall have remedy* by the due course of law; and right and justice administered without denial or delay." IND. CONST. art. I, § 12 (1816) (emphasis added). We find no record of the intentions of Indiana's framers in either 1816 or 1851 with respect to this provision.

But the principles embraced in Section 12 have a long and distinguished history. For millennia, many of the world's major cultures and religions have placed immense value on the preservation of an individual's good name or reputation. The ancient Wisdom Literature of the Jewish and Christian religions declares that "[a] good name is to be chosen rather than great riches." Proverbs 22:1 (Revised Standard). *See* 1 RAYMOND E. BROWN, THE LAW OF DEFAMATION IN CANADA 4 (1987) ("Some form of legal or social constraints on defamatory publications 'are to be found in all stages of civilization, however imperfect, remote, and proximate to barbarism.'") (quoting HENRY C. FOLKARD, THE LAW OF SLANDER AND LIBEL 7 (5th ed. 1891)); MARTIN L. NEWELL, THE LAW OF SLANDER AND LIBEL IN CIVIL AND CRIMINAL CASES 1–28 (Mason H. Newell ed., 3d ed.1914). In fact, many of the earliest law codes subjected defamatory speech to severe criminal and civil sanction. *See* NEWELL, *supra,* at 1–18.

These principles were embodied in the 1215 Magna Charta. Its provisions were transmitted to America largely through Lord Edward Coke's highly influential commentary on the Magna Charta, which was among the most frequently read legal texts in colo-

nial America. *See* David Schuman, *The Right to a Remedy,* 65 TEMP. L.REV. 1197, 1199 (1992). The historical antecedent of Article I, Section 12 of the Indiana Constitution is vividly seen in Article 40 of the Magna Charta, which Coke restated as providing:

> [E]very Subject of this Realm, for injury done to him in [goods, land, or person], . . . may take his remedy by the course of the Law, and have justice and right for the injury done him, freely without sale, fully without any denial, and speedily without delay.
>
> Hereby it appeareth, that Justice must have three qualities, it must be [Free, for nothing is more iniquitous than justice for sale; Complete, for justice should not do things by halves; and Swift, for justice delayed is justice denied]; and then it is both Justice and Right.

FAITH THOMPSON, MAGNA CARTA: ITS ROLE IN MAKING OF THE ENGLISH CONSTITUTION, 1300–1629, at 365 (1948) (quoting SIR EDWARD COKE, SECOND INSTITUTE 55–56 (4th ed. 1671)). Although neither the original federal Constitution nor its Bill of Rights contains a remedies clause, the drafters of many of the original state constitutions did include a remedies clause, and, as other states were added to the Union, many adopted similar provisions. *See* John H. Bauman, *Remedies Provisions in State Constitutions and the Proper Role of the State Courts,* 26 WAKE FOREST L.REV. 237, 243–44 (1991). English common law and American colonial governments protected reputation as a property interest. *See* Ronald J. Krotoszynski, Jr., *Fundamental Property Rights,* 85 GEORGETOWN L.J. 555, 592 (1997).

Presently, thirty-nine state constitutions contain,[16] or have been construed to con-

---

the plaintiff and invades the plaintiff's interest in his reputation and good name.") (footnotes omitted). Previously, this Court has noted:

> The right of reputation was early recognized in Anglo–American law, and the machinery of legal redress is at the disposal of any person to vindicate his good name. Many utterances of a defamatory nature are actionable *per se* and, in the very beginning of the law of defamation, the rule was established that language which imputed a species of misconduct to which the law attached a criminal punishment was actionable *per se,* without any allegations or

> proof of actual pecuniary injury. Thus, it is clear that the law recognizes and protects the individual's interest in his reputation from defamation that imputes criminal misconduct, regardless of pecuniary damage. . . .

State ex rel. Lopez v. Killigrew, 202 Ind. 397, 401–02, 174 N.E. 808, 810 (1931).

16. ALA. CONST. art. I, § 13; ARK. CONST. art. II, § 13; COLO. CONST art. II, § 6; CONN. CONST. art. I, § 10; DEL. CONST. art. I, § 9; FLA. CONST. art. I, § 21; IDAHO CONST. art. I, § 18; ILL. CONST. art. I, § 12; IND. CONST. art. I, § 12; KAN. CONST. bill of

tain,[17] remedies clauses, providing that state courts should be open to all and provide remedies for injury. *See* Bauman, *supra*, at 237 & Appendix (compiling state constitution remedies provisions); Schuman, *The Right to a Remedy, supra*, at 1201 & n. 25. These clauses, however, vary from constitution to constitution, protecting different combinations of the following interests: person, personal and real property, character and reputation, privacy, immunities, and other rights. *See* David Schuman, *Oregon's Remedy Guarantee: Article I, Section 10 of the Oregon Constitution*, 65 OR.L.REV. 35, 40 (1986) (citing 9 WILLIAM F. SWINDLER, SOURCES AND DOCUMENTS OF THE UNITED STATES CONSTITUTIONS 508 (1973)); Bauman, *supra*, at 284–88 (compiling state constitutional provisions). At least thirty-four states, including Indiana,

specifically identify reputation[18] or character[19] as a protected interest.

Of the thirty-nine states with a remedies provision, thirty-one[20] have adopted a negligence standard. Of particular significance is the fact that, of the thirty-four states that specifically protect reputation or character, twenty-four[21] have exercised the *Gertz* option to follow a negligence standard, and only one[22] (other than our Court of Appeals in *Aafco*) has opted for the actual malice standard. Oregon and Illinois, for example, have expressly identified the remedies provision in support of retaining the negligence standard. The Oregon Court of Appeals stated: "We also conclude that a higher standard of media liability than the First Amendment requires ... would unduly restrict the right assured by Article I, section 10."[23] *Bank of Oregon v. Independent News, Inc.*, 65 Or.App. 29,

rights, § 18; KY. CONST. bill of rights, § 14; LA. CONST. art. I, § 22; ME. CONST. art. I, § 19; MD. CONST. declaration of rights, art. 19; MASS. CONST. pt. 1, art. 11; MINN. CONST. art. I, § 8; MISS. CONST. art. III, § 24; Mo. CONST. art. I, § 14; MONT. CONST. art. II, § 16; NEB. CONST. art. I, § 13; N.H. CONST. pt. I, art. 14; N.C. CONST. art. I, § 18; N.D. CONST. art. I, § 9; OHIO CONST. art. I, § 16; OKLA. CONST. art. II, § 6; OR. CONST. art. I, § 10; PA. CONST. art. I, § 11; R.I. CONST. art. I, § 5; S.C. CONST. art. I, § 9; S.D. CONST. art. VI, § 20; TENN. CONST. art. I, § 17; TEX. CONST. art. I, § 13; UTAH CONST. art. I, § 11; VT. CONST. ch. I, art. 4; W. VA. CONST. art. III, § 17; WIS. CONST. art. I, § 9; WYO. CONST. art. I, § 8.

17. *Boswell v. Phoenix Newspapers*, 152 Ariz. 9, 730 P.2d 186, 190–95 (Ariz.1986) (holding ARIZ. CONST. art. 18, § 6 to be a remedy guarantee, including remedy for injury to reputation); *Richardson v. Carnegie Library Restaurant, Inc.*, 107 N.M. 688, 763 P.2d 1153, 1161 (N.M.1988) (concluding that a right to a remedy is implicit in the state constitution), *overruled on other grounds, Trujillo v. City of Albuquerque*, 125 N.M. 721, 965 P.2d 305 (N.M.1998).

18. Twenty-three state constitutions specifically include a reputation interest: Alabama, Connecticut, Delaware, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Mississippi, Nebraska, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Dakota, Tennessee, Texas, Utah, West Virginia, and Wyoming. *See* ALA. CONST. art. I, § 13; CONN. CONST. art. I, § 10; DEL. CONST. art. I, § 9; ILL. CONST. art. I, § 12; IND. CONST. art. I, § 12; KAN. CONST. bill of rights, § 18; KY. CONST. bill of rights, § 14; LA. CONST. art. I, § 22; ME. CONST. art. I, § 19; MISS. CONST. art. III, § 24; NEB. CONST. art. I, § 13; N.C. CONST. art. I, § 18; N.D. CONST. art. I, § 9; OHIO CONST. art. I, § 16; OKLA. CONST. art. II, § 6; OR. CONST. art. I,

§ 10; PA. CONST. art. I, § 11; S.D. CONST. art. VI, § 20; TENN. CONST. art. I, § 17; TEX. CONST. art. I, § 13; UTAH CONST. art. I, § 11; W. VA. CONST. art. III, § 17; WYO. CONST. art. I, § 8.

19. Eleven state constitutions specifically identify a character interest: Arkansas, Colorado, Idaho, Massachusetts, Minnesota, Missouri, Montana, New Hampshire, Rhode Island, Vermont, and Wisconsin. *See* ARK. CONST. art. II, § 13; COLO. CONST. art. II, § 6; IDAHO CONST art. I, § 18; MASS. CONST. art. XI; MINN. CONST. art. I, § 8; Mo. CONST. art. I, § 14; MONT. CONST. art. II, § 16; N.H. CONST. pt. I, art. 14; R.I. CONST. art. I, § 5; VT. CONST. ch. I, art. 4; WIS CONST. art. I, § 9.

20. *Compare* states identified *supra* notes 16 & 17, *with* states identified *supra* note 13.

21. *Compare* states identified *supra* notes 18 & 19, *with* states identified *supra* note 13.

22. Other than the Indiana Court of Appeals in *Aafco*, Colorado appears to be the only state that applies the actual malice standard in private defamation actions notwithstanding a state constitution that specifically ensures a remedy for injury to character. *Compare* COLO. CONST. art. II, § 6, *with Diversified Management, Inc.*, 653 P.2d at 1106–09 (establishing actual malice standard but not discussing the state constitutional provision regarding a remedy for injury to character).

23. Article I, Section 10 of the Oregon Constitution, which provides in relevant part that "every man shall have remedy by due course of law for injury done him in his person, property, or reputation," is nearly identical to Article I, Section 12 of the Indiana Constitution.

670 P.2d 616, 627 (Or.Ct.App.1983), aff'd, 298 Or. 434, 693 P.2d 35 (Or.1985). The Illinois Supreme Court observed:

> The adoption of a requirement of actual malice cannot, of course, be justified on the theory that such a requirement furthers some overriding public policy of this State, for prior to New York Times it was not considered that liability for defamation required any showing of fault at all, let alone proof of actual malice. Moreover, the constitutions of this State have from the outset recognized as fundamental the rights of "enjoying and defending life and liberty, and acquiring, possessing and protecting property and reputation." (Const. of 1818, art. VIII, sec. 1.) 'From the outset it has been recognized that an individual is entitled to a remedy "for all injuries and wrongs that he may receive in his person, property or character." (Const. of 1818, art. VIII, sec. 12; Const. of 1848, art. XIII, sec. 12.) (In the most recent constitutions the word "reputation" is substituted for "character." Const. of 1870, art. II, sec. 19; Const. of 1970, art. I, sec. 12.) The freedom of speech provisions of both our former and present constitutions (Const. of 1870, art. II, sec. 4; Const. of 1970, art. I, sec. 4) recognize the interest of the individual in the protection of his reputation, for they provide that the exercise of the right to speak freely shall not relieve the speaker from responsibility for his abuse of that right.

Troman v. Wood, 62 Ill.2d 184, 340 N.E.2d 292, 297 (Ill.1975). The court went on to adopt the negligence standard. Id. at 299.

Defamation law is concerned primarily with protecting reputation.[24] Judicial concern for injury to reputation can be seen throughout Indiana case law. In 1847, four years before the adoption of Indiana's present constitution, this Court explained that "[a] libel is said to be a malicious defamation expressed in printing or writing, or by signs, pictures, & c., tending to injure the reputation of another, and thereby exposing such person to public hatred, contempt, or ridicule." Armentrout v. Moranda, 8 Blackf. 426, 427 (Ind.1847) (citing 2 Selw. N. P., 1061). In 1854, this Court stated that "[a]ny publication that tends to degrade, disgrace, or injure the character of a person, or bring him into contempt, hatred, or ridicule, is as much a libel as though it contained charges of infamy or crime." Johnson v. Stebbins, 5 Ind. 364, 366–67 (1854). In State ex rel. Lopez v. Killigrew, 202 Ind. 397, 401, 174 N.E. 808, 810 (1931), we observed that the "right of reputation was early recognized in Anglo–American law, and the machinery of legal redress is at the disposal of any person to vindicate his good name."

Clearly, legal recognition and protection of a person's reputational interest is deeply entrenched in our history and practice. The Indiana Constitution expressly protects an individual's right to remedy for harm to reputation. This fact is particularly significant in determining how Indiana should exercise the Gertz option. Strongly favoring reasonable recourse to remedy for defamation injuries, our express constitutional provision supports a common law rule of accountability upon proof of failure to use reasonable care, rather than one imposing responsibility only upon proof of actual malice. This is consistent with the jurisprudence of an overwhelming majority of other states.

### 3. Responsibility for Abuse of Free Speech

In protecting the freedom of speech and the press, the Indiana Constitution does not merely reiterate the language of the First Amendment. Rather, it both emphasizes the broad scope of the freedom and requires responsibility for its abuse. Indiana's provision states: "No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever, but for the abuse of that right, every person shall be responsible." IND. CONST.

---

**24.** The Aafco court correctly recognized that defamation law protects at least two distinct interests of individuals: (1) the desire to preserve certain aspects of their lives from unwarranted intrusion, and (2) the desire to preserve their reputations and standing in their communities. Aafco, 321 N.E.2d at 588 n. 7 (citing as an example Rosenblatt, 383 U.S. at 92, 86 S.Ct. at 679, 15 L.Ed.2d at 609 (Stewart, J., concurring)).

art. I, § 9 (emphasis added). Tortious defamation constitutes such abuse of the right to speak and print freely. As this Court recently explained:

> Section 9 was certainly not intended to create a private warrant by which an individual might impair the fundamental rights of private persons. Our common law of torts, the mechanism by which we vindicate such private encroachments, makes this clear.[25] When the expressions of one person cause harm to another in a way consistent with common law tort, an abuse under § 9 has occurred.

*Price v. State,* 622 N.E.2d 954, 963–64 (Ind. 1993). *See also id.* at 959 (citing *Gibson v. Kincaid,* 140 Ind.App. 186, 221 N.E.2d 834 (1966), for the proposition that "expression will be curtailed only when it infringes another's rights."). The *Price* Court concluded, on the one hand, that "treating as abuse political speech which does not harm any particular individual ('public nuisance') does amount to a material burden" but, on the other hand, "sanctioning expression which inflicts upon determinable parties harm of a gravity analogous to that required under tort law does not." *Price,* 622 N.E.2d at 964.

Indiana citizens have long understood that the clause "every person shall be responsible" means accountability by liability for damages in our courts of law. Contemporaneous with the constitutional convention that resulted in the adoption of the Indiana Constitution, this Court affirmed a judgment awarding damages in a defamation action against a newspaper, stating:

It is plain, from the general context of the decisions in cases of this kind, that booksellers and publishers of newspapers are considered as standing in situations of *peculiar responsibility,* and far from relaxing in their favor the general rule that all persons are bound so to carry on their trade or business as *not to injure others,* the Courts of law have felt the necessity of applying it in their cases with the utmost stringency. The press is a most potent engine for the diffusion of both good and evil, and, while on the one hand we can scarcely estimate too highly the *advantages of its perfect freedom,* for all useful purposes, on the other, we cannot but be sensible of the necessity of a strong curb to prevent such freedom from degenerating into licentiousness. The law, however, in holding publishers of books and newspapers responsible for slanderous attacks upon private character, only carries out, with respect to them, the same principles which are applicable to injuries resulting from the transaction of other kinds of business.

*Dunn & Another v. Hall,* 1 Ind. 344, 354 (1849) (emphasis added).[26] *See also Sourbier v. Brown,* 188 Ind. 554, 559–60, 123 N.E. 802, 804 (1919) (discussing joint and several liability for the primary and secondary publications of libelous statements and using the phrases "responsible for," "held responsible for," and "the consequences of which he is responsible" in the same context with "is liable for the consequences" and "be held for damages"); *Wayne Works v. Hicks Body Co.,* 115 Ind.App. 10, 19–27, 55 N.E.2d 382, 386–89 (1944) (en banc) (using, in a libel

---

**25.** In footnote 15, the *Price* majority stated:
> In 1851 our law recognized, as it does now, that expression might constitute a tort actionable by a private party, *McJunkins v. State,* (1858), 10. Ind. 140, even if it was political in nature. *Prosser v. Callis* (1889), 117 Ind. 105, 19 N.E. 735 (libel action would lie against newspaper for charge that county auditor "botch[ed]" county books); *Heilman v. Shanklin* (1878), 60 Ind. 424 (libel action would lie against newspaper for charge of vote buying).
> *Price v. State,* 622 N.E.2d 954, 964 n. 15 (Ind. 1993).

**26.** The Court repeatedly used the words "responsible" and "responsibility" when referring to defendants being accountable or liable for defama-

tory statements. *Dunn,* 1 Ind. at 354–55. The Court also expressed concern about publishers avoiding responsibility for libelous statements. *Id.* at 355–56. ("[I]f he [the defendant newspaper publisher] chose to leave the management of his business in the hands of a foreman, *he must be held equally responsible* for the neglect or incompetency of the latter, in not obeying his instructions, and in suffering such a thing to be done. If publishers could *avoid responsibility* by telling their foremen not to admit anything personal, and then absenting themselves while a libel was inserted, they could very easily make the newspapers vehicles for the circulation of the most atrocious slanders with perfect impunity.") (emphasis added).

action, the concepts of "liable for" and "responsible for" interchangeably). ·

Neither the framers of the Indiana Constitution nor this Court, past or present, have intended to cloak defamation with immunity under Indiana's free speech clause. The express inclusion of the "responsibility for abuse" limitation in Section 9 is clear instruction to the contrary.

Numerous other states have expressly relied upon their state constitution's "responsibility for abuse" provision, finding that it mandated or guided their choice of the negligence standard under the *Gertz* option. The Kentucky Supreme Court determined that, "while it is our option under *Gertz* to adopt a standard of fault, Kentucky Const., Sec. 8,[27] mandates that we adopt a standard which adequately protects the private individual from defamation. We choose simple negligence." *McCall v. Courier–Journal & Louisville Times*, 623 S.W.2d 882, 886 (Ky. 1981). The Oklahoma Supreme Court concluded that the state constitution [28] expressly "weighted the right [to liberty of speech and press] with the responsibility for an abuse of that right" and required a "balanc[ing of] the news media rights with that of a private individual" and determined that the negligence test expressed in *Gertz* was "more parallel" to the state constitution. *Martin v. Griffin Television, Inc.*, 549 P.2d 85, 92 (Okla.1976). *See also Troman*, 340 N.E.2d at 297, 299 (noting that "[t]he freedom of speech provision[ ] of ... our ... present [Illinois] constitution[ ] (... art. I, sec. 12) [29] recognize[s] the interest of the individual in the protection of his reputation, for [it] provide[s] that the exercise of the right to speak freely shall not relieve the speaker from responsibility for his abuse of that right" and adopting the negligence standard rather than the actual malice standard in private defamation actions against media defendants); *Jones v. Palmer Communications, Inc.*, 440 N.W.2d 884, 898 (Iowa 1989) (construing Article I, Section 7 of the Iowa Constitution [30] to require the adoption of a negligence standard for private plaintiffs in defamation actions); *Gazette, Inc. v. Harris*, 229 Va. 1, 325 S.E.2d 713, 725 (Va.1985) (holding that Article I, Section 12 of the Virginia Constitution [31] "recognizes the balance to be struck between the right of free expression enjoyed by the individual and the press on the one hand and the right of defamed individuals to hold the speakers 'responsible' for damage to reputation on the other" and determining that "a negligence test strikes a proper balance"); *Denny v. Mertz*, 106 Wis.2d 636, 318 N.W.2d 141, 150–51 (Wis.1982) (holding that "a private individual need only prove that a media defendant was negligent in broadcasting or publishing a defamatory statement," stating that "freedom of the press is not an absolute, but may be limited to protect the valid reputation interest of members of society," and concluding that "a negligence standard complies with the guarantee of freedom of the press contained in the Wisconsin Constitution" [32]).

27. The Kentucky Constitution provides:
Freedom of speech and of the press—Printing presses shall be free to every person who undertakes to examine the proceedings of the General Assembly or any branch of government, and no law shall ever be made to restrain the right thereof. Every person may freely speak, write and print on any subject, being responsible for the abuse of that liberty. KY. CONST. § 8.

28. The Oklahoma Constitution states that "[e]very person may freely speak, write, or publish his sentiments on all subjects, being responsible for the abuse of that right...." OKLA CONST. art. II, § 22.

29. The Illinois Constitution provides in relevant part that "[a]ll persons may speak, write and publish freely, being responsible for the abuse of that liberty." ILL. CONST. art. I, § 4.

30. The Iowa Constitution provides in part that "[e]very person may speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right...." IOWA CONST. art. I, § 7.

31. The Virginia Constitution provides in part that "any citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right...." VA. CONST. art. I, § 12.

32. The Wisconsin Constitution provides in relevant part that "[e]very person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right...." WIS. CONST. art. I, § 3.

To the extent that the U.S. Supreme Court allows, we should apply the "responsibility for abuse" language of Article I, Section 9 of our Indiana Constitution to favor the common law rule that would require publishers of defamatory statements to be responsible in damages when they negligently injure private figure plaintiffs or plaintiffs involved in issues of private concern.

### 4. What's Best for Indiana: "Negligence" or "Actual Malice"?

The "responsibility for abuse" clause of Section 9 and the "remedy for harm to reputation" clause of Section 12, separately and collectively, counsel this Court to conclude that, in private defamation actions, media defendants should be held accountable upon proof of failure to use reasonable care, rather than only upon proof of actual malice.

The U.S. Supreme Court has reserved to the states the power to fashion their statutory or common law of defamation as it applies to private individuals because that Court recognized the important, legitimate state interest in protecting the reputations of its citizens. This important value has been memorialized in our constitution and the decisions of our courts, until *Aafco*. The Indiana Constitution calls us to respect both of the constitutional interests that are in issue here— the free speech interest and the reputational interest. While vigorously preserving the crucial right of Indiana citizens to speak, write, and print freely, we should also preserve the rule of accountability for failure to exercise reasonable care when a private individual suffers harm from the publication of a defamatory falsehood. The applicable standard for private figure plaintiffs should be that of negligence, whether the subject matter is one of public or private concern.[33]

The same negligence standard should likewise apply in defamation cases where public official/figure plaintiffs sue media defendants, but where no matter of public concern is involved. Just like the state prerogative to choose the negligence standard for private figure plaintiffs in matters of public concern, U.S. Supreme Court opinions appear to permit each state to adopt its own standard when the defamatory statements are matters of private concern, regardless of the status of the plaintiff. In these cases, the defamatory statements are not directed to the public conduct of public officials/figures and would thus be beyond the scope of the federal constitutional protections. Thus, I would hold that, to the extent allowed by the U.S. Supreme Court, when public officials/figures bring defamation actions against media defendants and the defamatory speech does not involve his official or public conduct or matters of public concern, the same negligence standard would apply.[34] Stated differently, this negligence standard would apply to those defamation actions that lie outside the scope of the special protection afforded to free speech under the U.S. Constitution.

### 5. Preserving Indiana's Standards of Proof and Appellate Review

In his separate opinion, Justice Boehm asserts not only that Indiana common law should follow the *Aafco* actual malice requirement, but further that such actual malice must be proven by clear and convincing evidence. I disagree. For the same reasons that I favor the negligence standard rather than actual malice, I am convinced that we should retain our preponderance of the evidence standard[35] rather than impose

33. In his opinion concurring with the majority, Justice Boehm opines, "[W]e have a quarter of a century of experience under *Aafco* and so far the harm to the citizenry is not apparent." Slip op. at 471. With the actual malice rule of *Aafco* in place during this period, the unlikelihood of success at trial or on appeal would counsel media-defamed citizens against pursuing any legal action or taking an appeal. To the extent that there may have been harm to our citizenry, it thus would not have reached our attention. This lack of cases on appeal does not establish the absence of actual harm to Indiana citizens.

34. This is consistent with Justice Boehm's understanding and implied approval of the majority opinion as holding that the negligence standard is applicable to defamation claims based on matters of no public concern.

35. *Compare* Ind. Civil Pattern Jury Instruction No. 35.13 (1989) (pattern instruction for standard defamation cases), *with* Ind. Civil Pattern Jury Instruction No. 35.33 (1989) (pattern instruction for public official/figure defamation cases).

upon private defamation plaintiffs the additional burden of proving their case by clear and convincing evidence. Even if we choose the optional actual malice test for private figure defamation cases, the present Indiana standard of proof at trial should be retained. Moreover, the present standard is all the more important if the actual malice requirement is adopted. I concur with Justice Boehm, however, in his recognition that Indiana's conventional standard of appellate review applies to private figure defamation cases subject to the actual malice requirement. In reviewing claims of insufficient evidence in private figure defamation cases, our standard of appellate review now requires that we neither reweigh the evidence nor judge the credibility of witnesses but consider only the evidence most favorable to the judgment along with all reasonable inferences, and reverse only if there is a lack of proof on an essential element of the plaintiff's claim. *Martin v. Roberts*, 464 N.E.2d 896, 904 (Ind.1984). Even in those rare instances, such as punitive damages, in which our preponderance standard is replaced by the clear and convincing standard of proof, Indiana appellate courts will affirm the judgment if, "considering only the probative evidence and the reasonable inferences supporting it, without weighing evidence or assessing witness credibility, a reasonable trier of fact could find such damages proven by clear and convincing evidence." *Bud Wolf Chevrolet, Inc. v. Robertson*, 519 N.E.2d 135, 137 (Ind.1988). Indiana courts should not heighten appellate scrutiny of jury verdicts by using the federal standard of independent appellate evaluation of the full record to determine whether the evidence of actual malice is also clear and convincing to the appellate tribunal.

Using the federal independent appellate evaluation of the record standard results in a significant number of jury verdicts being reversed on appeal. This point is graphically illustrated by reports that less than a third of libel verdicts against media defendants survive after independent review. *See* NOWAK & ROTUNDA, *supra*, § 16.33, at 1093 (citing Milo Geylelin, *Libel Defendants Fare Well on Ap-*

*peal, Research Finds*, WALL STREET J., May 31, 1994, at B10, col. 1 (midwest ed.)); Seth Goodchild, Note, *Media Counteractions: Restoring the Balance to Modern Libel Law*, 75 GEO. L.J. 315, 323–24 (1986). Adoption of the federal standard of appellate review and application of the *New York Times* proof standard (i.e., actual malice by clear and convincing evidence) would mean likely reversal to most jury verdicts awarding damages to defamation litigants in actions against media defendants.

Justice Boehm is also correct in retaining our standard of appellate review because adoption of the federal independent review standard would also detract from the right to jury trial in civil cases which is expressly ensured by Article I, Section 20 of the Indiana Constitution.[36] The existing standard of appellate review reflects our keen awareness of a jury's unique capacity to weigh conflicting evidence, to judge witness credibility, and to consolidate the diverse perspectives and experiences of individual jurors into one verdict. Rather than adopting a standard of appellate review that imposes elevated scrutiny and casts suspicion upon jury decisions, we should preserve our existing standard that presumes the correctness of their verdicts and honors them with respectful deference and consideration.

### C. Conclusion

The majority issued its opinion to elaborate on the state standard of proof required in defamation cases brought by private individuals. It candidly acknowledges that this issue may not be relevant to this case or properly before the Court, but explains its discussion as appropriate "as it relates to the future of defamation law in Indiana." Slip op. at 452 n. 7. The facts of the case before us do not present the issue of interest to the majority. This case was not tried to the jury on the basis of the plaintiff being a private individual and thus was not subject to the optional state standards permitted under *Gertz*. Rather, the trial court here had determined and instructed the jury that the plaintiff, Bandido's Inc., was a "limited public

---

**36.** "In all civil cases, the right of trial by jury shall remain inviolate." IND. CONST. art. I, § 20.

purpose figure." [37] As a defamation action brought by a public figure plaintiff, proof of actual malice was required as a matter of federal First Amendment law. *Curtis Publ'g,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094.

Because the trial court determined that Bandido's was a limited purpose public figure plaintiff, First Amendment jurisprudence as to the actual malice standard necessarily governed this case. This case does not involve the application of a state standard of proof permitted under the *Gertz* option. It is therefore unnecessary to the resolution of this appeal to discuss the elements of proof for private figure defamation plaintiffs. Because the opinions of my colleagues undertake discussion of an issue not presented by the facts of this case, however, I respond with the foregoing considerations.

The majority's preference to repudiate the negligence standard of proof in favor of the actual malice standard for private figure defamation cases presents an unnecessary and substantial impairment to the right of injured citizens to seek legal recourse and remedy in Indiana courts. This limitation is opposite to the words, spirit, and history of the Indiana Constitution, contrary to the overwhelming authority from other state jurisdictions, and detrimental to sound public policy. I believe that the majority approach endangers personal privacy, encourages irresponsible journalism, and unnecessarily deprives injured persons of reasonable recourse for harm suffered from defamatory distortions and falsehoods published by entertainment and news media. For these reasons, I dissent.

SHEPARD, C.J., concurs.

---

**37.** The trial court instructed the jury: "In this case, the statements on which suit has been brought relate to a limited public purpose figure as well as a matter of public interest at least for the purpose of the statements at issue." Final Instruction No. 2, Record at 850. The plaintiff did not object to this instruction. *See* Record at 2913.